## THRASHER *vs.* INGRAM AND WIFE.

[DETINUE FOR SLAVES.]

1. *Husband's right to reduce wife's choses in action to possession.*—The wife cannot, by any proceeding recognized and enforced in a court of law, deprive the husband of his common-law right to reduce to possession during coverture her choses in action; consequently, in an action brought by husband and wife jointly, to recover slaves belonging to the wife, the facts that they were living separate and apart from each other, and that the suit was prosecuted against the wishes of the wife, are irrelevant and immaterial.

2. *Objection to deposition on account of defects in certificate of commissioner.*—It is no objection to a deposition, (Code, §§ 2322, 2323,) that it is not affirmatively shown that the answers of the witness were reduced to writing, either by the commissioner, the witness, or some impartial person, as nearly as may be in the language of the witness: if the answers contain no marks of suspicion on their face, these requirements of the statute will be presumed to have been complied with, in the absence of evidence to the contrary.

3. *Authentication of foreign transcript.*—A certificate of " the chairman and presiding justice of the court of pleas and quarter-sessions " of a specified county in North Carolina, appended to a transcript which purports to contain " certain entries upon the minutes of said court concerning the probate " of a will, to the effect that the clerk, " whose name appears to the foregoing certificate, was at the time of signing such certificate, and still is, the true and lawful clerk of said court, duly elected, appointed, and qualified; that his signature is genuine, and his certificate in proper form; and that the above is a true impression of the seal of said court,"—is a substantial compliance with the requisitions of the act of congress respecting the authentication of foreign transcripts.

4. *Presumption in favor of regularity of foreign probate.*—The courts of this State will presume, in favor of the regularity of the foreign probate of a will, which was admitted to probate as a valid will of personalty, after the trial of an issue *devisavit vel non,* that there was a good and valid reason for the particular verdict and judgment rendered.

5. *Effect of foreign probate of will as evidence.*—The foreign probate of a will assuming to pass personal property, which probate contains nothing restrictive of its operation, so far establishes the will, as to uphold the bequests contained therein.

6. *Sale by tenant for life.*—A sale of personal property, by one having a life estate or other partial interest therein, does not affect the title of the remainder-man.

7. *General rules of construction of wills.*—The general rules for construing wills are, that effect must, of possible, be given to the intention of the testator, to be gathered from the whole instrument; that the general intent must prevail over the particular; that clauses apparently conflicting must, if possible, be so reconciled as to make each one operative ; and that, in case of irreconcilable repugnancy, the latter clause shall prevail over the former.

8. *Bequest construed as not creating collective estate in widow and children.*—Under a will, by which the testator first bequeathed and devised to his wife, "for her comfortable maintenance, and for the comfortable maintenance of her family, and to enable her suitably to educate her children," a plantation, several slaves, and other personal property, "during her natural life or widowhood, or until my [his] children by her come of age or marry ;" by another clause, devised to his youngest son the same plantation, describing it as "all that parcel of land hitherto specified and set apart for the use of my [his] wife and younger children, still allowing to his mother during her widowhood all that interest necessary for her maintenance and comfort ;" and, by a third clause, directed that his youngest daughter should be maintained and educated "out of the proceeds of the property aboved described," and, "when she shall have come of age and married," that she should be furnished with certain specified articles of personal property,— *held*, that these clauses did not create a collective estate in the widow and children.

9. *Legacy held vested, and not contingent.*—Under a bequest to the testator's widow, during life or widowhood, and "upon the termination of her right, either by marriage or by death, that then all the remainder of the finally undevised perishable property be divided btween" his youngest son and daughter, the children take a vested legacy.

10. *Assent of executor to legacy.*—Where slaves are bequeathed to the testator's widow during life or widowhood, with a vested remainder to his two youngest children, and a further provision that, in the event of the death of either child before attaining its majority, "the survivor shall be sole heir or heiress," an assent by the executor to the widow's legacy is an assent to the legacy to the remainder-men, and to the interest which the survivor of them takes under the last provision.

11. *Husband's marital rights.*—The husband's marital rights attach to a slave in which his wife has a vested remainder, when the slave is, at the time of the marriage, in the possession of the tenant for life with the assent of the executor : *secus*, if the slave, at the time of the marriage, is in the possession of a third person, who claims adversely to the wife under a purchase from the tenant for life.

APPEAL from the Circuit Court of Coosa.

Tried before the Hon. E. W. PETTUS.

THIS action was brought by John N. Ingram and Martha, his wife, to recover certain slaves, together with

damages for their detention, which the plaintiffs claimed under the will of William S. Alexander, deceased, who was the father of Mrs. Ingram, and who died in North Carolina, in 1827; which will contained the following provisions:

"*Imprimis*, it is my will and pleasure, that my wife Martha retain possession, and enjoy, without let or molestation, her bed and furniture, and all other property which she possessed at the time of her marriage; to which property I relinquished at that time, by a written agreement or contract now in my possession, all claim; and further to enable my beloved wife to have an independent home, and that she and [her] family may be in comfortable circumstances when I am dead and gone, I will and bequeath to my said wife Martha, for her comfortable maintenance, and for the comfortable maintenance of her family, and to enable her to suitably educate her children, all that plantation known as the "Newell plantation,' including the 'Reed tract,' containing each about 130 or 140 acres; also, including two lots of Robert Davis' plantation, containing 45 acres each, and adjoining to each other; also, all the aforesaid tracts, adjoining together, and supposed to contain in all about 420 acres; two horses, (her choice,) her saddle and bridle, four milk-cows, (her choice of my stock,) six head of sheep, all my hogs that are at Robert's plantation, two plows, two pairs of horse-gear to serve two plows, one pair of iron-hung double-trees, two single-trees and clevises, one ax, four hoes, one mattock, one iron-wedge, two feather [beds] and furniture, with their steads, one walnut chest of drawers, one square walnut table, (viz., my common dining table,) six windsor chairs, one fire shovel and tongs, one pair of fire-dogs, loom and tackling, all the cupboard and kitchen furniture, one big wheel, one little spinning-wheel, one clock reel, one candlestick and snuffers, six silver table-spoons, six silver tea-spoons, one large oak chest, one Bible, two medical books, (viz., *Bache's Family Physician*, and *Ewell's Lady's Companion*,) and one *Confession of Faith*; also, in addition to the preceding farming utensils, two bull-tongue plows, in order to the

profitable use of the above landed property, &c. I further will and bequeath to my said wife Martha the following family of negroes—Smith and his wife, Fanny, and their five children, viz., *Abigail*, Abraham, Caroline, Adeline, and Henry—during her natural life or widowhood, or until my children by her shall come of age or marry. In the same manner, and under the same conditions, all the previous devises made to my wife *is* to be understood. Should my wife marry again, my will is, that all the property hitherto to her devised revert back into my estate, and be reserved as a fund for the maintenance and final advancement of my children by my said wife Martha.

"*Item*, I will and bequeath to my beloved son Kosciusko, his heirs and assigns forever, all that parcel of land consisting of the several tracts hitherto specified and set apart for the use of my wife and younger children; still allowing to his mother, during her remaining my widow, all that interest necessary for her maintenance and comfort.

"*Item*, I devise that my daughter Martha be maintained and educated out of the proceeds of the property above devised; and when she shall have come of age and married, that she be furnished a feather bed and furniture, a horse and saddle, a cow, and one negro girl, viz., Caroline, or Adeline.

"*Item*, I devise that my Sopman plantation, consisting of 200 acres, be sold at the discretion of my executors, and the moneys put to interest, and reserved as a fund for the liberal education of my youngest son, Kosciusko, provided that measure shall appear advisable.

"*Item*, I devise that, upon the *extermination* of the right of my wife to the property hitherto devised, either by marriage or by death, that then all the remainder of the finally undisposed of perishable property be divided between my above-named son and daughter, in that proportion that my son possess two thirds of the whole, and my daughter one third.

"*Item*, my will is, that if, in the judgment of my executors, the capacity of my youngest son, Kosciusko, shall be promising for a liberal education, and the measure be

forbidden by no special reason, that in that case he be put to a grammar-school, under the direction of my executors, and his education duly prosecuted to the above issue.

"*Item*, I devise that if one of the above-named children die before he or she shall come of age, that the survivor shall be the sole heir or heiress; and should neither survive to come of age, that then the whole property revert into my estate, to be equally divided amongst my children, accounting my daughter Theresa's family one.

"Having disposed of my wife and younger children, as their interest and endowment are necessarily involved with hers, I proceed to the case of my elder children," &c. (The remaining clauses of the will contained provisions in favor of the testator's elder [children, which are not considered by the court as influencing the construction of the clauses above set out, and which are therefore omitted as immaterial.)

The action was commenced on the 30th March, 1854. Issue was joined on the plea of *non detinet,* "with leave to either party to give any special matter in evidence." The slaves in controversy were two of the children of the girl *Abigail*, mentioned in the second clause of the will, (which is the first of the clauses above set out,) and were shown to be in the defendant's possession at the commencement of the suit. It was proved by the plaintiffs, that the girl Abigail was sold by Mrs. Alexander, the testator's widow, in North Carolina, in 1833, to one Wm. C. Means, and brought by him to Alabama; that Mrs. Alexander died in 1853, having never married a second time; that Kosciusko, the testator's youngest son, died in 1836, in his thirteenth or fourteenth year; and that Martha, the testator's youngest daughter, married said John N. Ingram, in North Carolina, in 1840.

The defendant filed the following interrogatories to the plaintiffs: 1st, (to each of said plaintiffs,) "Are you living together as husband and wife, or were you so living together when this suit was brought?" 2d, (to Mrs. Ingram alone,) "Was this suit brought with your knowledge and consent? State whether it is being prosecuted at your instance, and whether you do not desire it to be

42

dismissed." The court refused to compel Mrs. Ingram to answer these interrogatories, but ruled the defendant to trial on the answer of Mr. Ingram alone; to which ruling of the court the defendant excepted.

Before going into the trial, the defendant moved the court to suppress several of the plaintiffs' depositions, on the following grounds: "1st, because the caption of each of said depositions, and the certificate of the commissioners, do not show that the several witnesses were sworn as required by law; 2d, because the certificates to each of said depositions do not show that the testimony of the witnesses was taken down by the commissioners, or by the witnesses, or by any one in the presence of the commissioners, and in the language of the witnesses as nearly as may be; and, 3d, that the said several certificates do not show that the said several depositions were taken in the mode required by law." The court overruled the objections, and allowed the depositions to be read in evidence to the jury; and exceptions were reserved by the defendant to the decision. The depositions thus objected to were five in number; the captions and certificates thereto being as follows:

"John N. Ingram, and Martha S. Ingram *vs.* William A. Thrasher. In Coosa Circuit Court, Alabama. Deposition of Wm. C. Means, witness sworn and examined 1st December, 1856, at Harrisburg depot, Cabarras county, North Carolina, under and by virtue of a commission," &c., (properly describing it,) "to speak the truth, the whole truth, and nothing but the truth. William C. Means, of Cabarras county, North Carolina, being first sworn to speak the truth, the whole truth, and nothing but the truth, doth depose and say as follows," &c.

"I, Samuel C. Harris, one of the commissioners named in the case above stated, do hereby certify, that the evidence of the witness Wm. C. Means was taken down under oath, and subscribed by him in my presence, on the 1st December, 1856, at Harrisburg depot, Cabarras county, North Carolina; and that I have personal knowledge of said witness. Witness my hand and seal," &c.

Each of the other depositions contained a similar caption, and a final certificate in these words: "Examination taken, reduced to writing, subscribed, and sworn to, before me, this 8th day of April, 1856, as witness my hand and seal; knowing the witness to be the identical person mentioned in the commission."

The plaintiffs offered in evidence a certified transcript from the records of "the court of pleas and quarter-sessions" of Cabarras county, North Carolina, showing "certain entries upon the minutes of the said court concerning the probate of the last will and testament of Wm. S. Alexander, deceased, which entries are as follows:" 1st, an order appointing Daniel, Coleman guardian, *pendente lite*, of Kosciusko and Martha, infant children of said decedent; 2d, an order, made on the production of the decedent's will, and a *caveat* entered by Daniel Coleman, "that the same be submitted to a jury upon the issue *devisavit vel non;*" 3d, the verdict of the jury, in these words: "They find the paper writing in the following words and figures," &c., (setting out the will,) "to be the last will and testament of Wm. S. Alexander, deceased, as to his personal estate, and not as to his real estate, and that he did bequeath as therein mentioned;" and, 4th, the judgment and decree of the court, in these words: "Whereupon the court adjudged, that the same be admitted to probate. And L. H. Harris came into open court, and renounced his right to execute said will; and Alphonso Alexander and Philander Alexander, the other executors therein named, were duly qualified, and letters testamentary ordered to issue to them." All of these entries purported to have been made on the 15th January, 1827. The transcript contained another entry, purporting to be made at the January term of said court, 1856, on a writ of *procedendo* from "the superior court of law of said county," commanding an amendment *nunc pro tunc* of the probate of the will, so as to make it show that the jury were "empaneled and sworn."

To this transcript the following certificates were appended:

"State of North Carolina, ⎱ I, J. W. Scott, clerk of
　　Cabarras county.　⎰ the court of pleas and quar-
ter-sessions for the county aforesaid, do hereby certify,
that this and the preceding pages contain a full and per-
fect transcript, in the words and figures of the original, of
the record of the probate of the last will and testament of
William S. Alexander, deceased, in the office containing
the records of said court, and also of the order of amend-
ment made at the January term of said court, 1856, by
authority of which the said record of probate, originally
imperfect, was amended and made perfect as therein men-
tioned. In testimony whereof," &c.

"State of North Carolina, ⎱ I, R. C. Cook, chairman
　　Cabarras county.　⎰ and presiding justice of the
court of pleas and quarter-sessions for the county afore-
said, do hereby certify, that J. W. Scott, whose name
appears to the foregoing certificate, was at the time of
signing such certificate, and still is, the true and lawful
clerk of the said court of pleas and quarter-sessions for
the county of Cabarras, duly elected, appointed, and
qualified; that his signature is genuine, and his certifi-
cate in proper form; and that the above is a true im-
pression of the seal of said court. In testimony where-
of," &c.

"State of North Carolina, ⎱ I, J. W. Scott, clerk of the
　　Cabarras county.　⎰ court of pleas and quarter-
sessions for the county of Cabarras, do hereby certify,
that R. C. Cook, whose attestation appears to the above
and foregoing certificate, was, at the time of giving and
attesting such certificate, the true and lawful chairman
of said court; that his signature is genuine, and his cer-
tificate in due form of law. In testimony whereof," &c.

　The defendant objected to the admission of this tran-
script as evidence, on the following grounds: "1st, be-
cause there was no evidence that there was such a court
in North Carolina, or that it was a court of record; and,
2d, because the certificates to said transcript were not
sufficient to authorize the reading of the same in evi-

dence." The court overruled the objections, and admitted the transcript; to which the defendant excepted.

The plaintiffs also read in evidence, " from the statute laws of North Carolina," a section in these words : " The court of pleas and quarter-sessions shall, within their respective counties, take probate of wills, and order the same to be recorded in proper books kept for that purpose ; and shall make such orders for issuing letters testamentary, and letters of administration, to the persons entitled to the same; which shall be signed and issued by the clerk of the court." The defendant then read in evidence, "from the statute laws of North Carolina," the following sections : " No last will or testament shall be good or sufficient, in law or equity, to convey or give any estate, real or personal, unless such last will shall have been written in the testator's lifetime, and signed by him, or by some other person in his presence and by his direction, and subscribed by two witnesses at least, no one of whom shall be interested in the devise or bequest of said estate ; or unless such last will and testament be found among the valuable papers and effects of any deceased person, or shall have been lodged in the hands of any person for safe-keeping, and the same shall be in the handwriting of such deceased person, with his name subscribed thereto, or inserted in some part of said will ; and if such handwriting shall be proved by three credible witnesses, who verily believe such will and every part thereof to be in the handwriting of the person whose will it appears to be, such will shall be sufficient to give and convey real and personal estate." The time when these statutes were enacted is not shown in the bill of exceptions.

This being all the evidence in the cause, the court charged the jury as follows :

" If you find from the evidence that, in 1826, William Alexander resided in Cabarras county, North Carolina, and, during that year, made the will which has been read in evidence to you; that said Alexander, at the time of his death, owned and had in his possession the slave Abigail mentioned in said will; that said will was admitted to probate, in the early part of the year 1827, in the court

of pleas and quarter-sessions of said county, and letters testamentary thereon granted; that the testator's wife, his daughter Martha, and his son Kosciusko, mentioned in said will, were living at the time of the testator's death; that Kosciusko died, in his fourteenth year, in 1836; that the testator's widow did not marry again, but died in 1853; that his daughter Martha, in 1840, in said county, was married to the plaintiff, John N. Ingram; that the plaintiffs continued to reside in said county up to this time, and the relation of husband and wife existed between them during all that time; that the testator's widow, after the probate of said will and the grant of letters testamentary thereon, received said slave Abigail from the executor under the will, and, in the year 1833, sold said slave to Means; that said Means, during that year, brought said slave to Montgomery, Alabama, and sold her to John Thrasher, the defendant's father; that said Thrasher held said slave, and claimed her as his own, from that time until his death; that said slave, while in the possession of said Thrasher, gave birth to the two slaves here in controversy; and that the defendant received the possession of said two slaves, at the death of said John Thrasher, as one of the distributees of his estate, and was in the actual possession of them at the commencement of this suit, holding and claiming them as his own property,—then the plaintiffs are entitled to recover."

The defendant excepted to this charge, and then asked the court to instruct the jury, "that if the plaintiff Martha was twenty-one years old more than six years before the commencement of this suit, then the plaintiffs cannot recover under the evidence;" which charge the court refused to give, and the defendant excepted.

All the rulings of the court to which exceptions were reserved are now assigned as error.

MORGAN & MARTIN, for the appellant.

PARSONS & J. WHITE, ELMORE & YANCEY, and N. S. GRAHAM, contra.

Thrasher v. Ingram and Wife.

STONE, J.—Answers to the interrogatories propounded to the plaintiffs would have been entirely immaterial, and for this reason, if no other, there was no error in refusing to compel the female plaintiff to answer them. The argument which shows their immateriality is as follows:

According to the common law, which we presume to be of force in North Carolina, marriage operates a present gift to the husband of the wife's personal property in possession; and also clothes him with the right, during the continuance of the coverture, to reduce her choses in action to possession, and thus become the absolute owner of them. In this right to reduce to possession her choses in action, there is necessarily implied a right to sue for them; and of this right the wife cannot deprive him, by any proceeding recognized and enforced in courts of common-law jurisdiction. Even if husband and wife be living apart, that circumstance cannot deprive him of the common-law right to bring her property under the control of his marital rights.

True, the husband may, in a proper case, be compelled, by suit in chancery, to make a suitable settlement on the wife out of her property; but this mere right in her, unless proceedings be set on foot to enforce it, does not affect his legal right to recover the property.—Savage v. Benham, 17 Ala. 119; Chambers v. Perry, 17 Ala. 726; Montgomery v. Givhan, 24 Ala. 568; Blevins v. Buck, 26 Ala. 292; Manning v. Manning, 24 Ala. 386; 2 Kent's Com. (8th ed.) 107, 114; 1 Bright on H. & W. 24, 36; Hooper v. McWhorter, 18 Ala. 279.

It results from the principles above stated, that even if the plaintiffs were living separate, or if Mrs. Ingram was unwilling that this suit should be prosecuted, she had no right, save by bill in chancery under the rule above alluded to, to arrest the prosecution of this suit.

[2.] The correctness of the ruling of the court, in refusing to suppress the several depositions, depends on the proper construction of the two sections of the Code, 2322 and 2323. The first named of those sections is evidently a general direction to the commissioner as to the rules to

be observed by him in reducing the answers to writing. If this section stood alone, we would unhesitatingly pronounce it directory. The difficulty arises out of the next section.

It is contended that the word "manner," employed in section 2323, renders it necessary that the certificate of the commissioner shall *affirmatively* show that, in taking the deposition, he complied with each and every direction contained in section 2322. It is further contended, that if the certificate be wanting in any of those particulars, it is defective, and the deposition will be suppressed on motion.

We do not assent to this construction. Evidently, those requisites, which would not appear but for the caption and certificate—namely, the commissioner by whom the testimony was taken, the proof made, or knoweldge in the commissioner, of the personal identity of the witness, the time and place of executing the commission, and the fact that the witness was duly sworn—these should be expressly shown, in either the caption or certificate. The answers to the interrogatories stand on a different principle. *Per se*, they furnish evidence of the *manner* in which they are reduced to writing. If they, on their face, appear to be full, and no marks of suspicion are observable about them, we think they come fully up to the requirements of this section. The answers, certified by the commissioner, are, to that extent, his certificate of the *manner* of taking the deposition. In the absence of any showing to the contrary, the law presumes the commissioner does his duty.

We adopt this construction the more readily, because we can perceive no possible good that can come of the more rigid construction. The commissioner who would be either ignorant or corrupt enough to permit answers to be improperly written down, would be equally liable to authenticate them with a formal certificate. The motion to suppress the depositions, was rightly overruled.

[3.] We can perceive no solid foundation for the objection to the introduction of the record from the court of pleas and quarter-sessions of Cabarras county, North

Carolina. The certificate of the judge or presiding magistrate is substantially a compliance with the act of congress, and the primary court did right in admitting it. White v. Strother, 11 Ala. 720; McRae v. Stokes, 3 Ala. 401; Crawford v. Simonton, 7 Porter, 110; Dozier v. Joyce, 8 Porter, 303.

[4–5.] A question is made on the *effect* which the probate imparts to the will as an instrument of evidence. The argument is, that inasmuch as a will may be effectual for an enlarged or qualified purpose—may be even upheld as a valid appointment of an executor, and inoperative as to both real and personal estate, the court of construction can give effect to it only to this most limited extent; and that he who asserts its larger operation, must, on the trial, prove its execution as other written evidence is proved. It is, in this connection, contended, that the statute of North Carolina gives countenance to this view, in this, that while it defines the essentials of a valid will, it only declares that wills wanting in these essentials shall be "insufficient, in law or equity, to convey or give any estate, real or personal."

The authorities we have cited, *supra*, show that the probate of a will is a judicial proceeding. It is the judicial ascertainment of the final will of the testator, in reference to the ultimate disposition of such portion of his estate as the will is effectual to pass. Probate, being a proceeding *in rem*, "operates upon the thing itself. It defines, and in a great degree, creates, its *status*."—Deslonde & James v. Darrington, 29 Ala. 92. This *status* becomes a quality or *property* of the effects disposed of by the will, and binds all persons thereto, who claim in virtue of the will. As to them, and those holding under them, it is *res judicata*.

The record of the probate in this case expressly shows that the will of Mr. Alexander was established as a valid disposition of his personal property. That record, if we accord to it verity, is conclusive of the point raised on the probate of this will.

It is urged by appellant, that we should not be governed by this, because, under the statute of North Carolina which

was read in evidence, the same form and solemnity are necessary to constitute a valid will of both real and personal property; and from this it is argued, that in that State there can be no such a thing as a valid will of personal estate, which is not alike valid as to the real estate attempted to be devised by it.

The record does not inform us *when* the statute relied on was enacted. It may have been long since this will was probated. If necessary to the result in this case, we might feel it our duty, in support of the correctness of the judgment of the North Carolina court, to presume that the statute was enacted since this will was established. Gunn v. Howell, 27 Ala. 663. We feel relieved, however, from the decision of this question.

In Florey v. Florey, 24 Ala. 241, it was decided, that "fraud, or undue influence, in procuring one legacy, does not invalidate the other legacies, which are the result of the free will of the testator." In this case, there was an issue *devisavit vel non*. The precise form of the issue is not given. For aught that we can know, the devises of real estate by Mr. Alexander may have been declared inoperative, because they were obtained by fraud or undue influence. We feel bound to presume there was a good and valid reason for the particular verdict and judgment rendered in this case.

In thus declaring the effect of the record from North Carolina, we do not wish to be understood as deciding that, in the absence of such express statement, a different construction would be placed on it. The rule in England is, that "the granting of probate is conclusive as to the testamentary character of the instrument in reference to personalty."—Douglas v. Cooper, 3 My. & K. 378; 1 Jar. on Wills, 22, notes D, and 1–2; 2 Greenl. Ev. § 672. So, in most of the States of this Union, courts of probate, or orphans' courts, are established, with power to take probate of wills; "and where such power is conferred in general terms, it is understood to give to those courts complete jurisdiction over the probate of wills, as well of real as of personal estate, and, therefore, to render their decrees conclusive upon all persons, and not re-examinable

[collaterally] in any court."—2 Greenl. Ev. § 672, note 1 on p. 652; 1 Greenl. Ev. § 550; Darrington v. Borland, 3 Por. 9; Osgood v. Breed, 12 Mass. 525, 531; Tarver v. Tarver, 9 Peters, 180; Langdon v. Goddard, 3 Sto. 13, 23; Hunt v. Acre, 28 Ala. 580; Poplin v. Hawke, 8 N. H. 124; see, also, case of Wells' will, 5 Litt. 273; Brown v. Gibson, 1 Nott. & McC. 326; Crossland v. Murdock, 4 McC. 217; Bogardus v. Clark, 1 Edw. Ch. 266, 270; 2 Atk. 378; Clark v. Dew, 1 Russ. & M. 103; Hume v. Burton, 1 Ridg. P. C. 277; 4 Paige, 623; Maxwell v. Montague, 3 Atk. 546; Harrison v. Rowan, 3 Wash. C. C. 580–2–3; Dew v. Ayres, 1 Greenl. 153; Darby v. Mayer, 10 Wheat. 465–9.

We hold, then, that the probate of a will which assumes to pass personal property, which probate contains nothing restrictive of its operation, so far establishes the will, as to uphold the bequests contained therein.

[6.] The sale made by Mrs. Alexander conveyed away her title, whatever it was, and did not have the effect of destroying the estate reserved to her under the will, or of cutting off the remainder. The rights of the remainder-man continued the same as if she had made no convey-ance.—Jones v. Hoskins, 18 Ala. 489, and other authori-ties on the brief of counsel.

The only other questions presented by the record, are those which arise on the charge given and the charge re-fused. On these several points are made:

1. It is contended, that the right of the plaintiffs in this case is barred by the statute of limitations, because, under the will of Mr. Alexander, the widow, Mrs. Alexander, and her two children Martha and Kosciusko, took a collective estate *in presenti;* and inasmuch as the property had been adversely held for more than six years when this suit was brought, even since Mrs. Ingram attained to the age of twenty-one, the argument is that a recovery cannot now be had.

2. It is contended, also, that this suit is barred, because, under the will, the title of Mrs. Alexander terminated when her children *came of age or married.*

3. It is contended, that under the third and sixth items

of the will, the children do not take as remaindermen, but that on the termination of Mrs. Alexander's estate, the property reverted to the estate, and that the personal representative of Mr. Alexander alone has the right of action.

4. It is contended, that a new assent by the executor to the legacy to Mrs. Ingram was a necessary pre-requisite to the vesting of the legal title in her.

5. It is contended, that under the 8th item of the will, Mrs. Ingram takes the share of her deceased brother Kosciusko, only as his next of kin; that as to his interest, the legal title is in his personal representative; and as Mrs. Ingram has not the entire legal title, she cannot maintain the action of detinue.

The solution of each and all of these questions depends on the construction of Mr. Alexander's will.

[7.] The general rules for construing wills are, that effect must, if possible, be given to the intention of the testator, to be gathered from the whole instrument; that the general intent shall prevail over the particular; that the varying, and apparently conflicting clauses shall, if possible, be reconciled, so as to make each clause operative; and, in case of irreconcilable repugnancy, that the latter clause shall prevail over the former.—Denson v. Mitchell, 26 Ala. 360; Walker v. Walker, 17 Ala. 396; Pace v. Bonner, 27 Ala. 307; Miller v. Flournoy, 26 Ala. 724; Gibson v. Land, 27 Ala. 117.

The will of Mr. Alexander is very inartificially drawn. It employs language frequently without reference to accuracy, whether it be regarded in common or technical sense; and this remark applies as well to words of ordinary use, as to those of legal significance.

After the most mature deliberation, we have come to the following conclusions, as the most satisfactory construction we can place on this will, which evidently "has no brother:"

[8.] The 2d item of the will gives to Mrs. Alexander an estate in certain lands, slaves and other personal property, to continue during her life or widowhood, with the exception that, when the testator's children by the said wife

Martha should come of age or marry, the devise to her was to be qualified by the provisions of the 3d item in favor of his son Kosciusko; and the bequest to her was to be abated by the provision in the 4th item in favor of his daughter Martha, "when she shall have come of age and married." It will be observed that the 3d item, speaking of the identical land which had been previously, in the 2d item, given to Mrs. Alexander, "during her natural life or widowhood, or until [testator's] children by her shall come of age or marry," devised the same to his son Kosciusko, "his heirs and assigns forever, * * still allowing to his mother, during her remaining [testator's] widow, all that interest necessary for her maintenance and comfort." Under this item, the *title* to the realty certainly passed out of Mrs. Alexander when her son attained to lawful age; but there was charged upon it a trust, to the extent necessary for her *maintenance and comfort.*

Under the 4th item, Martha, the daughter, "when she shall have come of age and married," was to be furnished, out of the property given to her mother in the 2d item, "a feather bed and furniture, a horse and saddle, a cow, and one negro girl, viz., Caroline or Adeline."

Both these provisions were carved out of the devise and bequest to the widow in the 2d item; both might take effect while she was yet in life, and testator's widow; and they furnish a field of operation for the words in the 2d item, "or until my children by her shall come of age or marry." We therefore construe these items of the will substantially as follows: The devises and bequests to Mrs. Alexander, as found in the 2d item, were all to continue during her life or widowhood, except those portions disposed of over in the 3d and 4th items, which the wife was to enjoy only until testator's children by her shall come of age or marry.

If any doubt remain of the correctness of the above construction, we think that doubt will be dissipated by considering the subsequent items of the will. Both the 3d and 4th items absolutely provide for an interest in her after the children shall have come of age or married.

The 6th item is still more explicit. It fixes the termination of her right "to the property hitherto devised," at her death or marriage.

We attach no importance to the 5th item, as bearing on the question of construction. That seems to stand alone, and it does not appear that the land therein devised is mentioned any where else in the will.

We think there is nothing in the argument that this will creates a collective estate in Mrs. Alexander and her children. Evidently there was some trust for their benefit; but it was a mere equity in the proceeds. The legal title was in her. The right of the children in this property, before and after the termination of the mother's estate, was entirely different in nature and extent; their remedies in different courts.—See Hammond v. Neame, 1 Swanston, 35.

The property in controversy in this case consists of two of the children of Abigail, who is mentioned in the 2d item of the will. Whether this property ever reverted to the estate of Mr. Alexander, the testator, and thus revested the title in his personal representative, must depend on the 2d, 6th and 8th items of the will. The language of the 2d item is, "should my wife marry again, my will is, that all the property hitherto to her devised, revert back into my estate," &c. The language of the 8th item is, "should neither (Martha or Kosciusko) survive to come of age, that the whole property revert into my estate," &c. These are the only clauses of this will, bearing on this property, that make any mention of a reversion to the estate of the testator. Mrs. Alexander never married again, and is now dead. Martha, her daughter, *survived* to come of age, and married. Hence it is impossible that either of the contingencies, on which the property was to revert to the estate by any express provision of the will, ever can happen. The testator having declared there should be a reversion on the happening of either one of the two events, and having given other directions in reference to other events, the rule applies, *inclusio unius est exclusio alterius.* We hold, then, that under the first clause of the 6th item, and the first clause of the 8th item, no reversion

of the title of the property to the estate of the testator was contemplated. If the division of the property to take place on the termination of the right of the testator's wife, as provided by the 6th item of the will, was to be made by the executor, this is a naked power without any title in him.—See Dean v. Dean, 7 Monroe, 304; Oneal v. Beall, 10 B. Mon. 272.

An argument has been suggested, predicated on the last clause of the 2d item of the will. That clause reads as follows: "Should my wife marry again, my will is, that all the property hitherto to her devised revert back into my estate, and be reserved as a fund for the maintenance, education and final advancement of my children by my said wife Martha." The argument is, that this clause declares what is to be done with the property, if the title to the wife terminate during the minority of the children —namely, that it shall *revert* back into the estate, and be *reserved*, &c., until the children come of age or marry. It is contended that, under this clause, if the contingency had happened, the right to the slaves would have revested in the executor. The argument takes a further step, and contends that the first paragraph of the 6th item must be construed in connection with the last clause of the 2d item, and that the division spoken of in the said 6th item was to take place when the children should come of age or marry, and not sooner. The language of the 6th item is, "I devise that, upon the extermination [termination] of the right of my wife to the property hitherto devised, either by marriage or by death, that then all the remainder of the finally undevised perishable property be divided between my above named son and daughter, in that proportion that my son possess two-thirds of the whole, and my daughter one third."

As each of these clauses gives directions as to what is to be done with a large portion of the same property, in the event of the termination of the wife's estate by marriage; and the directions are apparently repugnant, of course we cannot give to each clause its literal meaning. The 2d item, by directing that the property be *reserved as a fund* for certain purposes, continuous in their nature, is

somewhat repugnant to the direction found in the 6th item, that *upon* the happening of the same contingency, the same property is to be *then* divided, &c..

We have said above that the contingency upon which the first of these two clauses is to become operative, never can happen. Hence we might dismiss its further consideration. Inasmuch, however, as the clause may enter into the construction of the whole will, we proceed briefly to state our conclusions, and the reasons on which they rest.

We hold, then, that items three and six are the testator's exposition of what he means, when he says in the 2d item, the property shall revert back into my estate, and be reserved as a fund—namely, that the land shall go to his son, and the personal property shall be *then* divided, in the portions there indicated. The reasons for this opinion are—

1. That item six, being posterior to item two, controls it, if the two are repugnant.

2. If we hold there is a reversion and reservation proper under each of the clauses under discussion, the two clauses become palpably inconsistent and repugnant, and cannot both be carried into effect, in this: Under the clause in the 2d item, both the real and personal estate mentioned in that clause *revert* back into the estate, should the widow put an end to her estate by marriage ; while under the 6th item, on the happening of the same event, only *the remainder of the finally undevised perishable property* would revert back. The 3d item gives the land to the son ; and hence it follows, that both these clauses, under the construction contended for, could not in the nature of things be carried out. Under the construction which we adopt, all can be made operative.

3. The construction contended for will give the lands exclusively to the son, on the termination of the widow's life estate by death or marriage, and reserve the slaves and other personal property, including farming utensils, as a fund for the maintenance, education and final advancement of the two children Martha and Kosciusko. These results certainly could not have been intended.

Thrasher v. Ingram and Wife.

4. If, under the construction contended for, we hold that the devise to Kosciusko contained in the 3d item was not to take effect until he' should come of age or marry, even though the right of his mother should determine before that time by her death or marriage, then we place this property in the following absurd category: If her right determined *by her marriage*, the whole property, both real and personal, under the 2d item, would revert back into the estate, to be reserved as a fund. On the other hand, if an end were put to her estate *by her death*, then, under the 6th item, only the "finally undevised perishable property" would revert back, leaving an intestacy as to this land, between the determination by death of the wife's estate, and the time when the children by her should "come of age or marry." Many of the clauses and expressed objects of the will would be defeated by this construction.

In the conclusions we have attained on these clauses, we think we give effect to the general intent of the will; and their perfect consonance with that thoughtful precaution which usually governs in such matters, commends them to our cheerful approval.

The 6th item of the will, if it stood alone and unexplained by other clauses, might be held to be a residuary clause. This construction is precluded by the 13th item, which is, in terms, a general residuary clause, later in the will, and more explicit in its language. Construing these two items together, they leave little or nothing for the 6th to operate on, unless it be held to embrace the undisposed of remainder in the personal property previously given to Mrs. Alexander during life or widowhood. Giving them that construction, we carry into effect the intention of the testator, both express and implied, to make provision for each of his children. Any other construction will render items six and eight nugatory; will leave the remainder in this property, after the termination of Mrs. Alexander's estate, undisposed of by any express provision in the will; and will leave these children with a very inconsiderable patrimony, compared with the provision for his other children. This construction is for-

43

bidden by the declared intention of the testator, that his wife "*and her family* may be in comfortable circumstances when [testator] is dead and gone ;" and by the concluding paragraph of this part of his will, where he says, "Having disposed of my wife and younger children, as their interest and endowment are necessarily involved with hers, I proceed to the case of my older children."

We hold, then, that the 6th and 8th items in the will relate to the undisposed of remainder in the personal property mentioned in the 2d item.

[9–10.] It was contended in argument that, as to an undivided two-thirds of this property, the claim of Mrs. Ingram was, at the time when the assent to the legacy of Mrs. Alexander was given, but a contingent remainder; and that such assent was not an assent to the contingent remainder. The case of Nixon v. Robins, 24 Ala. 663, is relied on in support of this proposition.

In the case last cited, a life estate in slaves was created by will in Mrs. Nixon, with a remainder in her son Thos. Nixon, contingent on his living to be twenty-one years old. No disposition was made of the intermediate interest, in the event Mrs. Nixon should die before Thomas attained to lawful age. She died during his minority, and the question was, who had this intermediate title. This court held, that there was a chasm between the two estates, undisposed of by the will, and that this intermediate interest must be administered as in case of intestacy. The necessary result was that, on the death of Mrs. Nixon, the title to the slaves revested in the executor of the will. The court intimated the opinion, that a new assent of the executor would be necessary to perfect the title of the remainderman, when he should attain the requisite age.

The case of Nixon v. Robbins is, in its facts, unlike the one we are considering. Here there can be no chasm, no intestacy. At the termination of the first estate, the estate of Martha and Kosciusko attaches in possession under the 6th item of the will; and if that estate fail under the provisions of the 8th item of the will, by the death of one or both of the children before they come of

age, the will then directs how the property shall go.—See 1 Roper on Legacies, 403, *et seq*.

We characterize the estate of Martha, the younger, and Kosciusko, secured to them under the 6th item of the will, as a vested legacy.—Gibson v. Land, 27 Ala. 117, and authorities cited; Savage v. Benham, 17 Ala. 119; Nixon v. Robbins, 24 Ala. 663; Travis v. Morrison, 28 Ala. 494, and authorities on the briefs of counsel in that case. This vested legacy, however, was not of the absolute *residuum* of the title. It was absolute, if both children should live to the age of twenty-one years. In the event either or both of them should die before attaining that age, then this remainder was defeated by a condition subsequent. If one lived to the age of twenty-one, and the other died before, the survivor was to have and enjoy the absolute title in the remainder. This precise event happened, and Mrs. Ingram is the survivor. We, then, characterize the estate of Martha S. and Kosciusko, under the 6th item of the will, as a vested legacy, defeasible on a condition subsequent.

We have shown that the entire title to this property has centered in Mrs. Ingram. We hold, that each successive stage in this title has accrued to her directly under the provisions of the will. Her legal title to the property did not accrue, until the death of her mother in 1853.

We cannot assent to the argument, that a new assent by the executor was necessary to vest in Mrs. Ingram the interest to which she succeeded under the 8th item of the will, as the survivor of her brother. We have found no authority which supports the argument, and we know or no principle which renders such an act necessary. The foundation on which this whole doctrine of assent rests, is, that both the executor and the creditors may have their interests guarded. We can imagine no reason for holding that, after an executor has once parted with his right to the property by assenting to a legacy, there could subsequently, on the termination of the particular estate, spring up a reason for a second expression of willingness to part with the property. We do not say a testator might not, by the terms of his will, render successive

assents necessary. There is nothing in this will which calls for an assent to the title of Mrs. Ingram which she acquired as survivor of her brother.

In Roper on Legacies, vol. 1, p. 570, it is said, "When a legacy is limited to several persons in the nature of remainders by executory devise, the executor's assent to the first taker will be considered an assent to those who are to succeed."—See, also, 1 Roper on Legacies, 568, *et seq.*; Sugden on Property, 64 Law Library, 285, *et seq.*

We believe we have answered and refuted the five propositions of appellant, stated above.

[11.] It is further contended for appellant, that the assent to Mrs. Alexander's legacy was an assent to the vested remainder; and that as Martha S. had a vested legacy in an undivided third part of these slaves, the possession of her mother was her possession. From these premises, the further position is assumed, that when Martha S. intermarried with Mr. Ingram, his marital rights attached to this undivided third part; and as to that interest, the legal title was not in her, but in him, and he alone can maintain a suit for it.

Such would doubtless have been the result, if Mrs. Alexander, at the time of the intermarriage of the plaintiffs, had been in possession of these slaves.—See Walker v. Fenner, 28 Ala. 367, and authorities cited. In this case, however, the slaves at the time of the marriage, and ever afterwards, were in the hands of others, who were holding in their own right, and adversely to the right of Mrs. Ingram. Under these circumstances, the slaves did not pass absolutely to the husband, but were choses in action belonging to the wife. They could not become the property of Mr. Ingram, until, during the coverture, he reduced them to possession, actual or constructive. Broome v. King, 10 Ala. 819.

There is no error in the record, and the judgment of the circuit court is affirmed.