East & Collins *v.* Burns.

(*Nashville.*    March 20, 1900.)

1. WILLS. *Testator's intention controls.*

To ascertain the testator's intention is the paramount considera-
tion in the interpretation of wills. His intention is to be as-
certained from a consideration of the whole will in connection
with the circumstances under which it was made. The ordi-
nary rules of construction and the ordinary meaning of lan-
guage will be made to yield to the clearly ascertained intention
of the testator. A general intent overrules an inconsistent
particular intent. (*Post, pp. 179, 181–183.*)

Cases cited: Gannaway *v.* Tarpley, 1 Cold., 572; Armstrong *v.*
Douglass, 89 Tenn., 223; Puryear *v.* Edmondson, 4 Heis., 48;
Connell *v.* McKenna, 1 Leg. Rep., 187; Jones *v.* Hunt, 96 Tenn.,
369; Fry *v.* Shipley, 94 Tenn., 255; Hottell *v.* Browder, 13 Lea,
676.

2. SAME. *Equality of distribution under.*

Where a testator declares, in terms, that "equality shall be the
controlling rule in the division " of his estate, and directs that,
"at " his death his executors shall appoint commissioners to
value his estate, taking advancements into the estimate, and
divide the whole estate equally among his children and grand-
children *per stirpes*, the valuation of the estate for division is
not intended to be made as of the date of testator's death, but
as of the date of the making of the appraisement by the com-
missioners, if that is not unduly delayed, and a delay of seven
months after testator's death is not unreasonable. (*Post, pp.
171, 172, 179–181.*)

3. SAME. *Intention controls taking effect at death.*

In such case the testator's expressed purpose and intention to
have absolute equality in the distribution of his estate so far
controls the ordinary statutory rule that a will speaks and
takes effect as of the testator's death, as to prevent loss and
deterioration of portions of his property between the dates of
his death and the appraisement, from working inequality in
the division of his estate. (*Post, p. 181.*)

4. SAME.  *Meaning of term, "at my death."*

The term, "at my death," means within a reasonable time after his death, when used by a testator with reference to the appraisement and distribution of his estate.  (*Post, pp. 179, 180.*)

5. SAME.  *Loss of part of estate before distribution.*

Testator enjoined absolute equality in the distribution of his estate, including advancements.  He devised a house and lot to a son, but it, with the residue of his estate, was to be valued for equal distribution within a reasonable time after his death. After his death, but before appraisement and division of the estate, a heavy loss was sustained in the burning of a business block of houses that so reduced the value of the estate as to make the value of the house devised to his son, added to advancements, more than that son's share.  But for said loss by fire, the son had not received more than his share.  *Held:* The son must refund so much of the value of the house and lot as, when added to his advancements, exceeds his equal share in the estate.  (*Post, pp. 171, 172, 179–183.*)

FROM   DAVIDSON.

Appeal from Chancery Court of Davidson County. H. H. COOK, Ch.

BAXTER & HUTCHESON, E. H. EAST, J. J. VERTREES, and C. D. BERRY, for East and Collins.

T. M. STEGER for Burns.

WILKES, J.   This is a bill to have construed the will of M. Burns.   The material facts reported by the Court of Chancery Appeals, are: July 4, 1896, M. Burns died in Davidson County,

Tenn., leaving no widow, but children and grandchildren. His estate was large, consisting of both realty and personalty. His indebtedness at his death was trifling in comparison with the value of his estate. He left a will and several codicils. The material parts of the will are as follows:

"*Item* 4. I direct that equality shall be the controlling rule in the division of my estate between my children and the descendants of such as are dead, or may die before I do, meaning hereby equality *per stirpes,* and not that each grandchild shall receive an equal portion with each child, but that the grandchildren shall receive the part their ancestor would have received had she or he been living at my death, and subject to the same advancements I herein charge against each child, or ancestor of grandchildren, and I hereby fix the advancements to be charged to each:

"My daughter, Mrs. Manella Collins, to be charged with eight thousand five hundred and eighty-seven dollars.

"My son, James Burns, with twenty-seven thousand nine hundred and forty-four dollars.

"My daughter, Mrs. Mary Hamby, with twenty-six thousand two hundred and seventy-two dollars.

"My son, Robert T. Burns, with forty-three thousand two hundred and thirty-seven dollars.

"My son, Ivo Burns, with thirteen thousand five hundred dollars.

"I have to this time given my daughter, Mrs. Glenn, nothing, and therefore charge her nothing by way of advancement.

"In the division of my estate each share named above will be charged with the sum specified. I have an account of the foregoing, and am confident it is just and fair, as between all parties, to the best of my ability and judgment.

"*Item* 7. I will and direct that, at my death, all my estate be valued by three prudent and discreet persons, to be selected by my executors, taking into the estimate what I have herein charged by way of advancements, and the whole divided equally between my children and grandchildren, *per stirpes,* as hereinbefore declared, charging advancements as herein directed, and any difference in the value of real estate shall be made up in money to be derived from personal estate, and my executors will make deeds to each party of the property so allotted to him or her, and I confer sufficient title and estate in the executors to make said deeds and declare these trusts.

"*Item* 14. I will and bequeath to my son, James Burns, for life, my house and lot on the west side of the Public Square, being the same now occupied by J. Ellis, and on his death the same is to go and descend to his children, and their descendants, *per stirpes,* but the entire property is to be valued by the persons hereinbefore referred to, and charged to my said son, James."

August 1, 1894, M. Burns added a codicil to his will, in which he revokes all charges for advancements against his son, Ivo, and gives him a share in the estate free of charge.

Some months after the death of the testator a large block of buildings known as the "Burns Block," was destroyed by fire.

After the destruction of the Burns Block, the executors appointed commissioners to value his estate. They valued the real estate, not counting the value of the Burns Block destroyed (which resulted in reducing the value of the real estate over $52,000), and adding together the advancements and the valuations of the real estate by the appraisers, and dividing by the number of shares, it made the share of each devisees $44,024.76. This did not include personal assets.

They valued the "Ellis house," given to James Burns, in the fourteenth item of the will, at $28,000. This, together with advancements charged to James Burns, would make his share more than $44,024.76. But this sum ($28,000), with his advancements, would not exceed his share of the estate, but would be less if the estate of the testator were valued as of the date of his death, and before the destruction, by fire, of the valuable Burns Block.

Deeds were executed by the executors to each devisee, respectively, for the property allotted to him or her, except for the share of James Burns

and his children. No deed was made to them, because—

1. They claimed that the title to the "Ellis house" passed to them under the fourteenth item of the will, and that no deed to them was necessary.

2. Two of the executors claimed that the "Ellis house" must contribute to the loss suffered by the destruction of the Burns Block, and that James Burns and his children were not entitled to all of the "Ellis house."

The Chancellor decreed:

"That the valuation directed to be made under item 7 of the will should be made as of the date of the death of the testator.

"That under Sec. 7, all the residue of the estate of the testator not specifically bequeathed by him was given to be divided among his children and grandchildren, named and referred to in Sec. 4 of the will, and that sufficient title was vested to said residue in the executors, for the purpose of making such division.

"That the Ellis house, given to James Burns, under Sec. 14 of the will, was not given to the executors, and that they had no interest in, or power over it, and that it passed, under the will, directly to, and vested in, James Burns and his children at the death of the testator.

"That the fire, which occurred on the second day of January, 1897, and destroyed the Burns Block, did not affect the title or the interest

given by item 14 of the will to James Burns and his children, and did not take from them any interest in said property, nor give to other legatees or distributees any interest in or claim upon it. That the loss which resulted from said fire must fall upon and be borne by the residue of the estate to which it belongs, and no part of such loss will be borne by the Ellis house.

"That the will of M. Burns speaks and takes effect as of the date of his death, and that its construction cannot be controlled or affected by any event which occurred afterwards."

Mr. Collins, one of the executors, and some of the devisees, appealed.

The Court of Chancery Appeals reversed the Chancellor, on the ground that equality of distribution was intended by the testator to be based upon an appraisement of his property, not at the date of his death, but at the date of its valuation by the commissioners selected by the executors under his will.

*Assignments of error*—It was error to find and report:

1. That the valuation of the estate for division should be made as of the date it was made by the commissioners, after the destruction of the Burns Block by fire, instead of at the date of the death of the testator.

2. That the devise in item 14 of the will, to James Burns and his children, of the "Ellis

house," could be affected and taken from them by an accidental fire, which occurred after the death of the testator.

It was error not to find:

1. That the title to the "Ellis house" vested in James Burns and his children at the death of the testator; that it was separated by the testator from all the balance of his estate, and formed no part of the residue; and that James Burns was entitled to the rents of the "Ellis house" immediately upon the death of the testator. . . .

3. That the will speaks and takes effect as of the · death of the testator, and did not postpone, but fixed, the time for the valuation of the estate for division at the death of the testator.

4. That the estate for division was what the testator left, and not what it might become ·from accident or neglect, mismanagement, or other cause not known to, nor contemplated by, the testator.

5. That the equality directed by the testator was as of the date of his death, and in his property as he left it; and that the "Ellis house," specially set apart to James Burns and vested in him, could not be called upon to contribute to make good an accidental loss to the residue· of the estate. This suit is alone for the construction of the will of M. Burns, deceased, and for a decree declaring the rights of the partise under the will. The only controversy is as to the rights of the parties in the "Ellis house," given to James Burns

and his children, under item 14 of the will. It is said no question would have been made as to the construction of the will but for the loss of the Burns Block, by fire, without sufficient insurance. But for this loss all parties would have agreed, and the Court of Chancery Appeals found and reported that James Burns and his children would have been entitled to the "Ellis house" under the will. So this suit is not caused by any uncertainty in the terms of the will, or as to the intention of the testator expressed in it, nor from any deficiency of assets at the death of the testator, nor from any mistake of the testator as to the condition of the estate, or the value of the property which he left for division, but the suit arises alone from losses which occurred after the death of the testator, and which resulted from the unauthorized effort of the executors to hold and manage the real estate after the death of the testator.

The questions presented are:

1. What is the interest of James Burns and his children in the "Ellis house," under the will of M. Burns, and when did they become entitled to it?

2. Will the delay in the valuation and division of the estate, and the subsequent loss of the Burns Block, effect an abatement of the interest of James Burns and his children in the "Ellis

20 P—12

house," which became vested in them under the will?

The argument for appellee is that—

1. The Ellis house was separated from the estate and vested in James Burns at the death of the testator.

2. The valuation of the estate for distribution should be made as of the date of testator's death.

3. The gift of the Ellis house, by the will, was a *pro tanto* division of the estate, and was not subject to abatement.

4. The Ellis house was a specific devise. Item 7, of the will, makes demonstrative legacies to equalize distribution of real estate. These legacies are charged on personalty—not on realty. There can be no abatement of realty to make good such inequalities.

5. The devise of the Ellis house was a *pro tanto* division. Parties are not entitled to have shares maintained equal, nor to a redivision, to make losses good.

6. Accidental losses should fall upon the owner of the property destroyed.

7. The holding of the Court of Chancery Appeals would defeat the intention of equality.

Much of these contentions might be conceded, so far as their basis is concerned, but we do not think the results follow as claimed. Without disposing of these several contentions separately and

*seriatim,* we will proceed to state what we think are the controlling features in the case.

It is one of the oldest and best established principles of the law of wills that the intention of the testator must control in the interpretation of the will and the disposition of the property. There were no unusual circumstances surrounding the testator. He had no creditors of any consequence, but had a number of children and grandchildren, and the dominant idea in his mind, and the primary purpose he had in view, was that the different branches of his family should share equally his property.

Equality was the controlling, dominant, and all-important consideration and intention manifest throughout his entire will. This will not be denied but conceded, but the question is, When is this equality to be fixed—that is, at what time? The will says: "At my death all my estate shall be valued by commissioners," and proceeds to direct the basis upon which the valuation should be made. We think it is evident that there should be no narrow construction given to the term, "at my death," but that the term as used is equivalent to the phrase "after my death." The actual scheduling and appraisement could not be made at the moment or day of his death, as might be contended upon a narrow and strict construction of the phrase. It is evident that the

executors could not, on the day, or at the moment of his death, select the commissioners, nor could they immediately list the property, ascertain its value, and proceed to divide. The testator was a man of affairs, and must have contemplated that time should be taken and deliberation should be used, and opportunity for information afforded, and he must have had in his mind that during this time there might be changes caused by the advancement, deterioration, or destruction of property, and this phrase must be read in the light of, and in subordination to, the leading, controlling intent of equality. This equality which the testator made so prominent, was, we think, to be based upon an appraisement of the property, not at the date of death but at the date when the commissioners should value it, provided that they were selected and acted in a reasonble time after his death. There does not appear to have been any unreasonable delay in the selection of the commissioners, nor in their action under their appointment, the appointment being made about seven months after the testator's death.

We are of opinion that a proper construction of the fourteenth clause of the will before referred to is not in conflict with this view. The clause must be construed in connection with other parts of the will and in view of the controlling, dominant feature of equality, and, so construed, it

means that James Burns and his descendants are
to have the house and lot mentioned, but it
must be treated as a part of the estate and esti-
mated as such, and upon such basis as will pre-
serve the equality required.    Nor does the hold-
ing in this case conflict with the well-established
rule that a will takes effect at the death of the
testator, nothing further or different appearing.
But this rule does not override the intention
of the testator that it shall vest in such way,
and to such extent, as to preserve equality in
the division and distribution of the estate.   There
is no principle better settled than that the inten-
tion of the testator must be gathered from the
whole instrument, and that whatever appears to be
the dominant and controlling intent must govern,
even if in conflict with some words, phrases, and
expressions, which, taken alone and separately,
might lead to a different conclusion or interpre-
tation.

The arbitrary and technical meaning of the
words must yield to the lawful intention of the
testator when ascertained. *Gannaway* v. *Tarpley,*
1 Cold., 572; *Armstrong* v. *Douglass,* 5 Pick.,
223; *Puryear* v. *Edmondson,* 4 Heis., 48; *Hop-
per* v. *Tucker,* 59 N. Y., 208-211; *Bowles* v.
*Smith,* 39 Conn., 218; *Crecelius* v. *Horst,* 78
Mo., 566; *Towne* v. *Weston,* 132 Mass., 516;
*Ford* v. *Ford,* 1 Swan, 435; *Frierson* v. *Van-
Buren,* 7 Yer., 606; *Dixon* v. *Cooper,* 4 Pickle,

179; *Schaffer* v. *Keitell,* 14 Allen (Mass.), 528; *Connell* v. *McKenna,* 1 Leg. Rep., 187.

In the case of *Gannaway* v *Tarpley,* 1 Cold., 572, the Court, in speaking of the fact that it is proper to look to the scope of the will and the surrounding facts and circumstances as often tending to throw light on the intention of the testator, adopt the language of Mr. Jarman on Wills, and say:

··Guided by the light thus thrown on the testamentary scheme, the judicial expositor may find himself justified in departing from the strict construction of the testator's language." 1 Cold., 574.

The testator is presumed to have used words in their ordinary sense, unless it appears from the context that he used them in some other sense, or, unless by a reference to extrinsic circumstances, the use of the words in their ordinary sense would render the provision of the will inoperative or insensible. *Mowatt* v. *Carow,* 9 Paige; 4 Heis., 51.

In *Hopper* v. *Tucker,* 59 N. Y., 208, the Court says: "But there is no rule of law that gives to terms an inflexible intent." *Knight* v. *Gould,* 2 Myl. and K., 295.

Mr. Redfield says in his work on Wills, Vol. 1, star page 419: "There is no better principle in regard to all rules of construction, wherever applied, than to use them as helps and assistants toward reaching the intent of the testator and

to abandon them whenever it is apparent they lead one aside from that object, thus making them our servants instead of our masters."

The construction of a will depends upon the intention of the testator, to be ascertained from a full view of everything contained within the four corners of the instrument, but this does not forbid a reference to the facts and conditions under which it was made. 1 Redfield on Wills, star pages 433-435; *Jones* v. *Hunt,* 12 Pick., 369; *Fry* v. *Shipley,* 10 Pick., 255; *Hottell* v. *Browder,* 13 Lea, 676.

The predominant idea of the testator's mind, if apparent, will be heeded as against all doubtful and conflicting provisions, which might of themselves defeat it. If the general intent and particular intent be inconsistent, the latter must give way to the former. Schouler on Wills, 476; *Stinson* v. *Vroman,* 99 N. Y., 74; *Hitchcock* v. *Hitchcock,* 35 Pa. St., 393; *Thrasher* v. *Ingram,* 32 Ala., 645; *Pickering* v. *Langdon,* 22 Mo., 413.

We are of opinion the decree of the Court of Chancery Appeals is correct, and that in the division of the estate it should be valued as of the date of the division after the death of the testator, and the several parties in interest should be made equal as of that date, it not being delayed beyond a fair and reasonable time. The decree of the Court of Chancery Appeals is affirmed, with cost.