# DAVIS et al. v. MITCHELL et al.—178 S. W. (2d) 889.

Western Section. June 11, 1943.

Petition for Centiorari denied by Supreme Court, February 5, 1944.

184

186

Testerman, Ambrose & Badgett, Fowler & Fowler, H. K. Williams, Jr., and Guy L. Webb, all of Knoxville, for complainants and cross-defendants.

Donaldson, Montgomery & Kennerly and Kennerly & Key, all of Knoxville, for defendants and cross-complainants.

ANDERSON, P. J. The ultimate question for decision is the construction to be given the will of S. B. Luttrell, a prominent citizen of Knoxville, who died some years ago, leaving in an active trust a large estate consisting of both real and personal property. It is asserted that the trust created by the will is of the kind known as a "spendthrift trust." Among the beneficiaries was the testator's grandson, David Sullins, who was single at the time of the testator's death. There is, however, a provision naming the wife of David Sullins as a beneficiary in the event of his marriage and death during the term of the trust leaving a wife surviving him. These provisions give rise to the controversy.

David Sullins is alleged to have intermarried with Dixie Anne Davis some three years after the testator's death. While the trust was still active, both were co-incidentally shot and almost instantly killed in an assault committed by one Farley in Harlan County, Kentucky. Both died intestate and without issue.

The original bill was brought by the personal representative of Dixie Anne Davis Sullins and her heirs at law and next of kin against the executrix and trustee under the will of S. B. Luttrell. The administrator of the estate of David Sullins is also named as a defendant therein. A cross-bill was filed by the executrix and trustee seeking a construction of the will. A further identification of the parties and statement of the pleadings is unnecessary.

Broadly speaking, the complainants contend that they as the representatives of Dixie Anne Davis Sullins are entitled to a certain part of the estate of the testator, S. B. Luttrell. This claim postulates three primary propositions, each of which is strenuously controverted by the defendants. These are as follows: (1) that David Sullins and Dixie Anne Davis were lawfully married; (2) that Dixie Anne survived her husband; (3) that as his widow she was entitled under the terms of the will to a certain part of the estate, which, being a vested, transmissible interest, passed upon her death intestate to the complainants as her real and personal representatives.

Alternative to the last proposition, the complainants contend that David Sullins took a vested, transmissible interest in the estate, which, upon his death, passed under the laws of intestacy.

The regular chancellor recused himself and the case was tried by the Honorable Hamilton Burnett, then a judge of the Circuit Court of Knox County, now a member of this court assigned to the Eastern section, sitting by interchange. Due to Judge Burnett's disqualification, the case, on motion of all parties concerned,

was transferred to Jackson and heard by the Western section of the court sitting at that place.

Pursuant to a demand by the complainants, the issue of whether Dixie Anne Davis survived her alleged husband was submitted to a jury who answered that question in the affirmative. A motion for a new trial by the defendants having been overruled, the chancellor proceeded to a consideration of the other two propositions. He ruled that Dixie Anne Davis and David Sullins had been lawfully married, but that the former took nothing under the will and that the interest of the latter was not a vested, transmissible interest but one which under the terms of the will terminated and reverted to the trust estate upon his death without descendants.

The bill was accordingly dismissed and the complainants appealed. The defendants filed the record for error, seeking a review of the adjudication made by the chancellor with respect to the validity of the marriage of David Sullins and Dixie Anne Davis and of his action in overruling their motion for a new trial as to the issue of survivorship, which the jury had found adversely to them.

There were certain other proceedings to which, in the view we have of the case, it is unnecessary to refer.

Upon the trial of the issue submitted to the jury, it was conceded by the complainants that in any view of the evidence there was but a very brief interval between the death of David and that of Dixie. The defendants contended that either there was no such interval at all, or that Dixie died first. As stated, the verdict was to the effect that Dixie survived David. The first question for decision is whether this verdict is supported by the requisite quantum of evidence.

■ The jury trial was pursuant to the provisions of Code, Section 10574, granting to either party to a suit in chancery the right to a trial by jury of any material fact in dispute, save in certain cases, of which this is not one. Code, Section 10579, provides that such trials "shall be conducted like other jury trials at law, the finding of the jury having the same force and effect, and the court having the same power and control over the finding, as on such trials at law." A verdict returned in such a trial is not merely advisory but is entitled to the same weight and effect as a verdict in a court of law. James v. Brooks, 53 Tenn. 150; McElya v. Hill, 105 Tenn. 319, 59 S. W. 1025; Beatty v. Shenck, 127 Tenn. 63, 152 S. W. 1033, and cases cited; see also, Mutual Life Ins. Co. v. Burton, 167 Tenn. 606, 72 S. W. (2d) 778.

The rule promulgated in Hunt v. Hunt, 169 Tenn. 1, 80 S. W. (2d) 666, applies to issues falling under the inherent jurisdiction of a court of equity and hence has no application here.

■ ■ In this case, therefore, the question in this court is the same as if the appeal had been from a judgment entered on the verdict of the jury in a trial at law, namely, whether there is any material evidence to support the verdict. Scruggs v. Heiskell, 95 Tenn. 455, 32 S. W. 386; Ray v. Crain, 18 Tenn. App. 603, 80 S. W. (2d) 113. Under established rules of procedure regulating the review of jury trials of issues of legal cognizance, this question must be determined upon a consideration of the evidence viewed in the light most favorable to the prevailing party, disregarding all that is repugnant to that view. So considered, there was material evidence to support the following version of the facts:

On the night of the tragedy, David and Dixie had been traveling in a four-door Dodge automobile, a type known as a sedan, with David driving. They were destined to Kenvir, Kentucky. At Pineville, Kentucky, they picked up a hitchhiker by the name of Van Bever. David continued to drive until they reached Harlan. En route, a number of stops had been made for the purpose of procuring ice and other accessories appropriate to drinking whiskey, a practice in which both David and Dixie frequently engaged. When the party reached Harlan, Dixie decided that David was too drunk to continue driving the car and at her insistence Van Bever took over its operation. Upon being relieved of this task, David got in the rear seat, leaving Van Bever and Dixie on the front seat, Van Bever under the wheel on the left and Dixie on the right. They continued in these respective positions until they reached Everts, Kentucky, shortly before 12:30 o'clock A. M. Being unfamiliar with the road leading out of Everts to their destination, Van Bever stopped at a street intersection to make inquiries of a man who turned out to be Farley, then standing under a street light with a pistol in a holster strapped on the outside of his clothing. Van Bever took him to be a peace officer of some kind.

When the car stopped David got out of the left rear door, walked toward Farley and engaged him in conversation, first asking the way to Kenvir. Failing to receive a satisfactory answer, David, for some unexplained reason, asked Farley two or three times to let him see the pistol which the latter was wearing. Farley declined, laughingly at first, saying, ''No, I don't play that way.'' When he made the third request, David, who was apparently very much intoxicated, held out his hand and

stumbled toward Farley and "put his hand on the pistol." This time Farley backed off three steps and with a stern face and stern voice again said, "I don't play that way." At or about this juncture, Van Bever turned to Dixie and asked her to get David back in the car before there was any trouble, saying "these Harlan County people shoot pretty easy." Dixie replied, "No, he will be all right," and asked for a drink of whiskey. Van Bever reached in the back end of the car for the water to be used as a chaser and just as he had accomplished this detail, three or four shots were fired, "real fast."

At this time David and Farley were standing on the left of the car, David being between it and Farley and on the side next to Van Bever who was still sitting on the front seat. Upon hearing the shots, Van Bever looked around and, as he testified, "saw the flame from the gun the last time Mr. Sullins was shot." He also saw that Sullins had fallen against the side of the car. Farley then turned the pistol toward Van Bever who "turned sideways" and "fell over in Mrs. Sullins' lap pretending to be dead." He remained in that position until shortly after an officer came on the scene.

The officer was Ray Lloyd, then chief of police of the town. At the time of the shooting he was at his home about three hundred feet distant. He had retired for the night. His wife, upon hearing the shooting, had awakened him. He had dressed hurriedly and reached the scene in four or five minutes. When he arrived Dixie was still sitting in the front seat ". . . . with her hand on the door handle." Van Bever was still lying on the seat with his head in Dixie's lap. David had gone around the rear end of the car and was lying partly on

the ground and partly on the running board on the right side.

The officer testified that "he was down on his knees, and his left arm and the side of his face was laying on the running board like that, when I found him." He also testified that David "had bled an awful lot on the car, run off on the ground;" that "I felt of his right arm to see if he had a pulse or anything and couldn't get any pulse; I listened to his heart to see if his heart was beating and I could get no heart beat at all. I believed then he was dead—been murdered." Following this testimony the witness was asked to "state what his condition was at that time with respect as to whether he was dead or alive." The chancellor sustained the defendant's objection to this question on the ground that this was not a matter about which a layman was competent to testify.

After his examination of David had been completed, the officer "ran up to talk to this lady sitting in the seat." At that time she was still leaning forward with her hand on the door of the car. He asked her what had happened but received no response. As to what occurred at this time, he testified as follows: "I looked over in the car, she began straightening up and I thought she was going to speak to me, and she just kept going on back, and seemingly straightened up all at once, and she got up real high, like that, and gave a struggle and dropped back with her head on the back of the seat, and I saw a man laying with his head in her lap, and he looked to me too right to be hurt . . . I got him out of the car and searched him and put him on the back seat. Said he was afraid to stand outside, afraid they would kill him."

The officer also testified "there was a considerable bit of blood under Mrs. Sullins, she leaned over, she had bled down in front and on this gentleman that had his head in her lap, and as she went back, she bled on the back of the seat. He had to clean the blood up before he could take the car to Harlan, and take a man to drive him."

Van Bever testified that when he got out of the car at the command of the policeman, David was "kneeling on the ground, one knee down and one up, with his head on the running board." There was a trail of blood from the left side of the car where David was when the shooting began, around the rear of the car to the right side where he fell. There was also a quantity of blood on the back of the front seat where Dixie had been sitting, extending from the top of the back of the seat down underneath the seat itself. The seat of the car and the back of the seat were so bloody that it was necessary to cover them with newspapers before the seat could be occupied by those who afterward drove the car away.

The officer further testified that "there was blood running out of his (David's) mouth on the running board of the car;" that, "I would say there was around a quart of blood there."

The undertaker and the sheriff were called and the bodies of Dixie and David were sent to the former's establishment. He testified that David's body had three wounds on it; "two bullets entered at or about the center of the right shoulder blade, behind, and they came out near the center of the shoulder right side front. One bullet entered the front one-half inch below the collar bone on the left side of the body, and came out halfway between the tip of the shoulder and base of the neck."

Only one bullet struck Dixie. The undertaker said from the stand that "it entered the left cheek, I would say one inch from the ear on the front side," and it came out "about one inch behind the right ear, going directly through the head." He ran a probe nearly as large as a pencil through the wound and found that "the bullet traveled in a straight direction as near as possible."

The jury manifestly accepted the testimony of the police officer, notwithstanding an attack upon his credibility by evidence of conflicting statements, and, if they were warranted in so doing, then we think it cannot be said that there was no material evidence to support the conclusion reached by the jury with respect to the survivorship of Dixie, when his testimony is considered with that of Van Bever and with the other circumstances.

But the defendants insist that when testifying on cross-examination, the police officer so far contradicted himself with respect to the crucial facts that his testimony cannot be regarded as evidence, thus invoking the rule announced in Johnston v. Cincinnati, N. O. & T. P. R. Co., 146 Tenn. 135, 240 S. W. 429, and that line of cases.

The cross-examination of the police officer was skillful and adroit. At its close, the witness was asked, "What you have told me, Mr. Lloyd, is all that took place—there is nothing else that took place, is there?" The answer was, "Nothing more than I have stated." Then, "And you have told it to me in the order in which it happened?." The reply was, "Yes, sir."

The contention is, that because, in the course of his cross-examination the witness did not say that he saw Dixie move after he had examined David, his testimony to that effect on direct examination was neutralized within the meaning of the rule invoked, and hence

cannot be considered as evidence. We think this is a misconception of the applicability of the rule. Properly considered, the inconsistency, if such it be, that was developed was no more than a failure to give in the concluding general questions the remaining details given on direct examination in response to specific questions and about which he had not been specifically asked on his cross-examination. The rule contemplates a case where a witness both specifically affirms and specifically denies the same proposition with no explanation of the inconsistency. The logic of it is that under those circumstances it would be mere caprice to say that the affirmation was any stronger than the denial, or vice versa, and hence neither version has any probative value.

██ We think the rule can never find application unless there has been what is equivalent to a specific and catagorical denial of that which has been affirmed, unaccompanied by any reasonable explanation of the discrepancy. The failure of the officer to respond to the closing general inquiry by enumerating everything else that had occurred and to which he had testified on his direct examination, may have been a proper matter for the jury to consider in passing on his credibility, but we do not think it can be said to have cancelled out his affirmative testimony upon the point in question. If it were otherwise, then, carried to a logical conclusion, any witness could be asked on cross-examination to state all that occurred on a particular occasion and if he omitted any material fact to which he had testified on direct examination, the part omitted would have to be rejected as a matter of law. This, we think, is not the rule. To so hold would be going further than our courts have ever gone and in our opinion the rule is one that is not to be extended,

203 N. Y. S. 248

especially in view of the fact that the right to trial by jury of disputed issues of fact in a case at law is provided by the Constitution and in chancery by legislative enactment.

██ ██ Error is assigned on the charge to the jury wherein they were in substance and effect told that if the preponderance of the evidence showed that Dixie lived longer than her husband, "even though she lived just a slight bit longer, (it) would be sufficient for you to decide in their (complainants) favor. The time is not of the essence in that particular."

It is insisted upon the authority of In re Burza's Estate, 151 Misc. 577, 272 N. Y. S. 248, that this was error; that the inherent nature of the subject was such as that evidence showing that Dixie lived "just a slight bit longer," would necessarily make any conclusion based thereon speculative.

As applied to the facts of this particular case, we think there was no reversible error in that part of the charge. The case cited is distinguishable upon its facts. It involved the death of a man and his wife by asphyxiation, and the opinion is that of a court of original jurisdiction sitting as a trier of fact upon conflicting evidence. Because they were impeached, the judge declined to believe the witnesses who testified that the wife was alive after the husband was ascertained to be dead. This left only the fact of death by a common disaster. In such a case the judge properly said that on account of the nature of the question, its inherent uncertainty, the courts will not undertake to solve the problem of which survived. In the same connection, however, he said, "If there are other circumstances shown, tending to prove survivorship, courts will then look at the whole case for the purpose of

determining the question.'' And that is the kind of a situation we have in the present case. Here the triers of fact manifestly did not reject but accepted the testimony of the witness tending to show the pivotal fact.

The defendants next contend that the chancellor did not approve the verdict in the manner required by the rule. It is insisted that in overruling the motion for a new trial he declined to weigh the evidence and especially to pass on the credibility of the witnesses, saying that this was a question for the jury.

██ ██ So far as is concerned any question in this particular case, we think the rule applicable in this connection is that prevailing in jury trials at law. This is, that the appellate court has no power to act on a motion for a new trial until the circuit judge has acted in the manner required by pertinent procedural rules. Cumberland Telephone & Telegraph Co. v. Smithwick, 112 Tenn. 463, 79 S. W. 803; State ex rel. v. Kenner, 172 Tenn. 34, 109 S. W. (2d) 95. The rule, applicable here also, that a verdict in a civil case at law will not be disturbed on appeal when supported by any material evidence, is based mainly upon the consideration that the trial judge was satisfied with the verdict and approved it. Curran v. State, 157 Tenn. 7, 4 S. W. (2d) 957; Cumberland Telephone & Telegraph Co. v. Smithwick, supra. This means an approval which comprehends determination of all matters that it is the duty of the trial judge to decide and that in making his decision he has considered all factors proper to be considered and none other. The pertinent cases are reviewed in State ex rel. v. Kenner, supra, and a discussion of them is unnecessary.

██ Where the motion for a new trial is overruled and nothing more appears, it will be conclusively pre-

sumed that the trial judge fully and properly performed his function and was satisfied with the verdict. But where, in addition to this action, the record reflects his observations made in disposing of the motion, these may be looked to for the purpose of determining whether the overruling of the motion in reality evidenced a satisfaction with the verdict in the sense that there was a decision of all questions necessary to be decided by the trial judge made upon a consideration of all pertinent factors and none other. Carter v. Pickwick Greyhound Lines, 166 Tenn. 200, 60 S. W. (2d) 421. We say this because we think that "satisfaction," used in this connection, means a conclusion arrived at in the manner contemplated by the rule defining the duty of the judge in disposing of a motion for a new trial. The authorities leave no doubt that upon the consideration of such a motion it is his duty to weigh the evidence which of necessity requires that he pass upon the credibility of the witnesses. See, State ex rel. v. Kenner, supra, and cases cited; and Hamburger v. Illinois Cent. R. Co., 138 Tenn., 123, 196 S. W. 144; Ragan v. Ezell, 166 Tenn., 212, 60 S. W. (2d) 148.

As said, the defendants' contention is that the remarks made by the chancellor in disposing of the motion show that he failed in this particular.

In the course of his remarks the chancellor among other things, did say in substance that the credibility of the witnesess was a question for the jury and not the court and in the same connection that there was material evidence supporting the complainants' contention and hence the issue was one for that tribunal to decide.

If the motion of which the chancellor was disposing had been one for a new trial only, there can be do doubt

but that the defendants' contention would have to be sustained. But such was not the case. The motion had a dual purpose. The first part of it did not challenge the verdict as being unsupported by the requisite quantum of evidence, but was exclusively a motion "to sustain the motion made at the conclusion of the complainants' evidence and renewed at the conclusion of all the evidence to withdraw the issues from the jury and for the Court to decide the issue in question in favor of the defendants and cross complainants." In substance and effect the grounds of this motion were that there was no evidence to support the verdict and that since the evidence presented no controverted question of fact there was no issue to submit to the jury. Manifestly, therefore, the motion was quite a different thing from a motion after verdict challenging the sufficiency of the evidence to sustain the jury's action.

After setting out these grounds specifically and concluding with a prayer for a decree in favor of the defendants and cross-complainants without regard to the verdict of the jury, the motion then continued under a specifically numbered head as follows: "In the alternative the defendants and cross-complainants move the court to set aside the verdict or special findings of the jury and grant them a new trial." This was followed by the usual specific grounds, including one to the effect that the verdict was not supported by a preponderance of the evidence, one that the court refused to submit to the jury an issue tendered by the defendants, one alleging error in the charge of the court, and one of certain alleged misconduct on the part of a juror.

The remarks made by the chancellor show that he was considering both motions together, and we think

it clear that those relied upon by defendants were directed to the aspect of the motion that challenged the propriety of the chancellor's action in declining to withdraw the issues from the jury in accordance with practice outlined in Mutual Life Ins. Co. v. Burton, 167 Tenn. 606, 72 S. W. (2d) 778. So considered, it is conceded that the view expressed by the chancellor with regard to his functions and those of the jury was correct.

The next question for decision is presented by the defendants' contention that the alleged marriage of Dixie and David was void and subject to collateral attack. On January 19, 1937, a marriage ceremony was celebrated between David Sullins and Dixie Anne Davis in Morgan County, Tennessee. It was shown that the latter and one E. L. Chipps were married on January 13, 1934, in Dade County, Georgia, and that Chipps was alive as late as February, 1941. On February 22, 1935, while Chipps was confined in the Brushy Mountain Penitentiary, Dixie Anne Davis Chipps filed a petition for divorce against him in Juvenile and Domestic Relations Court of Knox County. This proceeding resulted in a decree rendered on April 25, 1935, granting petitioner an absolute divorce. It is conceded that this was the only divorce action instituted by either Dixie Anne or her then alleged husband, Chipps.

The defendants and cross-complainants contend that for reasons presently to be stated, the decree of divorce was absolutely void. This the complainants deny, and contend, moreover, that even if this be true, it avails the defendants and cross-complainants nothing because the evidence shows that at the time Chipps went through a marriage ceremony with Dixie Anne Davis he was incapable of contracting a valid marriage for the reason

that he then had a living wife, one Edith O'Daniel Chipps. They also insist that the decree of divorce obtained by Dixie Anne from Chipps was not subject to collateral attack by the defendants and cross-complainants.

The chancellor held the marriage between Dixie Anne Davis and David Sullins valid on the ground that Dixie Anne's previous marriage to Chipps was bigamous and void. He did not specifically pass on the challenge to the validity of the decree of divorce granted Dixie from Chipps or the right of the defendants and cross-complainants to attack it collaterally.

The defendants and cross-complainants vigorously attack the ruling made by the chancellor and maintain, moreover, that he should have held the divorce decree void. The basis for the last-mentioned contention is as follows: as stated, the petition for divorce was filed on February 22, 1935. Process was issued on the same day to the sheriff of Knox County, returnable the third Monday in March, 1935. This process was returned unexecuted. On April 19, 1935, alias process, returnable on the first Monday in May, was issued and served on the defendant in Morgan County on April 24, 1935. On April 25, 1935, a judgment pro confesso and final decree granting an absolute divorce to the petitioner were entered. This decree recites among other things that "the cause came on for hearing on the 16th day of April 1935 . . . upon the record at large, including the bill and the pro confesso taken and entered and oral testimony of witnesses taken in open court."

Notwithstanding the recital that the case was heard on April 16, 1935, the decree is dated April 25, 1935, and was apparently signed by the judge on that date.

As above indicated, April 16, 1935, was some eight days before the process was served on the defendant, but controlling effect cannot be given to the recital in the decree that the case was heard on that date. It is apparent, we think, from the face of the record, that this was a mistake. It contradicts the recitals of the preceding paragraph of the decree wherein it is averred that it appeared ''to the Court that the defendant, E. L. Chipps, is duly in court by service of process and he having failed to make defense to the bill within the time required by law and rules of the court, it is ordered by the Court pro confesso be entered against the defendant and the cause set for hearing ex parte.'' The next paragraph begins: ''Thereupon the cause came on for hearing on the 16th day of April, 1935,'' etc. These recitals indicate that process had been served on the defendant at the time the pro confesso was taken and that the pro confesso was taken before the cause was heard.

Moreover, the decree containing these recitals, concludes with the date line, ''This 25th day of April, 1935'', followed by the signature of the judge, thus reinforcing the conclusion that the final proceedings referred to in the decree were had on that date. The established rule that every intendment is in favor of the regularity and validity of a decree of a court of general jurisdiction requires that the apparent conflict be resolved in a manner that would sustain rather than defeat the decree, if this can be reasonably done, as we think it can.

But what is perhaps the chief contention is, that even so, the decree is void because the case was heard and the decree rendered before the return day of the process that was served on the defendant. The factual basis for

this contention is conceded to be correct, but we are unable to agree that it had the claimed effect.

The jurisdiction of the person differs fundamentally from jurisdiction of the subject matter in this, among other, respects: That the latter cannot be conferred by consent, express or implied, whereas the contrary is true of the former. We are concerned here with jurisdiction of the person and the question is resolved into one of when that jurisdiction attaches. The weight of authority and, as we think, of reason also, is to the effect that the jurisdiction is complete from the time of service. 3 Freeman on Judgments, Sec. 1289; see also, Vol. 1, Sec. 342, page 697; 31 Am. Jur., 129, 130. As was observed by the court in Fowlkes v. Webber, 27 Tenn., 530, in a somewhat different connection, "a defendant is supposed to be in court, after the service of the writ, until the final judgment without entering his appearance; . . . ." See also, Cooke v. Neighborhood Grocery, 173 Tenn., 681, 122 S. W. (2d), 438; and cf.: Collins v. Williams, 162 Tenn., 262, 36 S. W. (2d), 93. From this rule it follows that a judgment entered after service of process but before the return day or before the defendant's time to plead has expired, while erroneous and irregular, is not void on that account and hence not subject to collateral attack. Notes 61, Am. St. Rep., 485, et seq.: 38 Am. St. Rep. 655; 11 L. R. A. 155, 159; 3 Freeman on Judgments, Sec. 1289; West v. Williamson, 31 Tenn., 277; Glover v. Holman, 50 Tenn. 519; Cf: Porter v. Partee, 26 Tenn. 168. The rationale of the rule is that if the defendant appears as commanded by the writ, he will have ample opportunity to discover and have corrected any prior irregularities in the proceedings and this is all that is required.

▇▇ In the divorce proceedings here under consideration, jurisdiction having attached as of the time the process was served, the defendant in the petition was chargeable with the knowledge of all subsequent steps although he had no actual notice of them and did not in fact appear. See, Brite v. Grubbs, 144 Tenn., 647, 234 S. W. 759; 46 C. J., 548, Sec. 41. Being thus chargeable with notice of the irregularity in entering the decree of divorce before the return day of the process which had been served upon him, his failure to take appropriate steps to have the error corrected must be regarded as a waiver, which, being binding on him, was certainly binding on strangers to that proceeding, such as the defendants and cross-complainants in this case.

▇▇ This brings to the fore the further contention that a stranger to a divorce proceeding whose rights were not prejudiced by the entry of the decree at the time it was rendered cannot attack such decree either directly or collaterally. This contention is plausible and may have merit. The general rule is laid down in Magevney v. Karsch, 167 Tenn., 32, 65 S. W. (2d), 562, 568, 92 A. L. R., 343, to be that the assailant in a collateral attack upon a judgment "must show prejudice to some right of his that accrued prior to the rendition of the judgment." That case leaves nothing to be said on the subject of collateral attacks on judgments. True, the judgment there under consideration was not one of divorce, but there is, it seems, no substantial difference in the applicable rule, at least in the absence of overriding considerations of public policy. Freeman on Judgments, Sec. 1203.

However, it is not necessary for us to pass on the suggested question since we think the first ground discussed is conclusive. For the same reason it is unnecessary to

decide whether the ground on which the chancellor sustained the validity of the challenged marriage was supported by evidence meeting the established standard with respect to quality and quantity.

So, in considering the questions involving the construction of the will, we must proceed upon the assumption that David Sullins and Dixie Anne Davis were lawfully married and that she survived him. These questions have been briefed and argued exhaustively and with much ability and their solution has occasioned no little investigation and reflection.

The testator, Samuel B. Luttrell, was a prominent and highly respected citizen of Knoxville. As stated, he died November 20, 1933. The grandson, David Sullins, was the son of a daughter of the testator who predeceased her father. As we have also said, David Sullins and Dixie Anne Davis were married on January 19, 1937, and both died intestate July 28, 1939, having had no children. Mr. Luttrell's will was executed on March 20, 1928, and included three codicils executed respectively on March 19, 1929, July 7, 1932, and September 30, 1933. He left surviving him his wife, three sisters, two daughters, four grandchildren and three great-grandchildren, as well as some nephews and nieces. One sister, Mrs. Jessie Thomas, and his nephews and nieces are not mentioned in the will and no further reference to them is necessary. The sisters provided for in the will and who survived the testator were Mrs. S. B. Mitchell and Mrs. Charles E. Griffeth. Mrs. Mitchell died in October, 1934. Mrs. Griffeth is still living and has three children, Mrs. Thomas McCormick, age about fifty, Mrs. T. G. Tate, age about 54, and Mrs. Charles Griffeth, Jr., age about 56. The testator's widow who survived him died in February, 1934. His daughter, Jennie Luttrell Mitchell, died in May, 1941,

leaving two children, Margaret and Mary, both of whom were then married. Margaret has two children, the elder of whom was born about five years after the testator's death, and Mary has one, born about four years thereafter. The testator's other daughter, Mary L. Jones, · died childless in March, 1940. The grandson, Samuel Luttrell Sullins, whose mother predeceased the testator, is still living as is his wife. They have three children, Mary Katherine Gentry, William David Sullins and Samuel Sullins, Jr., all of whom were living when testator died. Sam Sullins, Jr., has two children. Mary Katherine Gentry and William David Sullins are childless.

The will as originally drawn was divided into seven consecutively numbered articles. The controversy is mainly concerned with the proper construction and effect of the provisions of Articles 4 and 6.

Article First has six consecutively numbered sections and is the only one that is so divided. By the opening sentence, the testator wills and bequeaths all of his property to the Bankers Trust Company in trust for the "purposes hereinafter set out". Section 1, immediately following,· provides for the payment of debts. Section 2 provides that the trustee shall take charge of all of the property remaining after the payment of debts and "hold, administer, preserve and distribute the same as hereinafter specifically directed, and for the terms hereinafter specifically directed, and to the parties hereinafter specifically directed." Section 3 confers upon the trustee the power of sale of personal assets for the purpose of reinvestment in "good, safe, income-bearing securities or property such as in the judgment of said officials (of the named trustee) will produce the highest income consistent with absolute safety". Section 4 makes a similar provision with respect to real estate.

The term of the trust is fixed by Section 5 in the following language:

"Section 5. The term of the trust shall be a period of twenty-five (25) years from and after my death, but it shall not terminate until the death of my wife and two sisters to whom I am giving certain income therefrom during the term of their lives, and said trust shall not extend further than twenty-one (21) years and nine (9) months after the death of the last survivor of said three (3) lifetime beneficiaries to-wit, my wife and two sisters."

Section 6 provides for the distribution by the trustee of the income from the trust property and is divided into three consecutively numbered sub-sections, of which sub-section 3 is divided into 6 consecutively numbered paragraphs. Sub-section 1 directs that $600.00 per month be paid from the income to the testator's wife so long as she shall live. Sub-section 2 provides that $50.00 per month be paid to each of the testator's two sisters, Mrs. S. D. Mitchell and Mrs. Charles Griffith, so long as she should live. Sub-section 3 provides that "all the rest and residue of the income thus arising from my estate shall be distributed by my Trustee as follows: To the daughter, Margaret, 25%; to the granddaughter, Margaret L. Mitchell, 6%; to the granddaughter, Mary L. Mitchell, 6%; to the daughter, Mary L. Jones, 25%; to the grandson, Samuel Luttrell Sullins, 23%; to the grandson, David Sullins, 15%."

Then follows Article Second, which provides for all the legacies to daughters and granddaughters or to their sole and separate use free from the dominion, control and indebtedness of any present or future husband.

Article Third is in the following language:

"All of said property thus given to my children and/or grandchildren is vested in said Bankers Trust Company

as Trustee for the use and benefit of each of said beneficiaries, and no part of the same is to be subject to execution or other legal process for any debt or liability which he, she or they may have heretofore contracted or may hereafter contract, nor shall he, she or they sell the same or any part thereof and during the term of this trust shall have no interest therein except to receive the rents and profits herein provided as going to them for their support through said Trustee.''

Article Fourth is as follows:

''During the term of this trust the descendants of any deceased child or grandchild, if any, shall be entitled to his or her parents' share of said income, and in case of the decease of any child or children without descendants the said income shall become a part of the trust estate to be distributed pro rata to the remaining beneficiaries, except that in the case of the death of my grandson Samuel Luttrell Sullins, leaving his wife surviving him, she shall be entitled to share equally with their children in the income arising from said estate or the corpus thereof as hereinafter directed. Like provisions will be made in case of the marriage of my other grandson, David Sullins, and his subsequent decease during the term of the trust leaving his wife surviving him.''

By Article Fifth the trustee is required at the end of each six months' period to render to each of the beneficiaries an account of its trusteeship.

Article Sixth.is in the following language:

''At the conclusion of the said trust, whether the same shall conclude at twenty-five (25) years, or whether it shall conclude at twenty-one (21) years and nine (9) months, after the death of certain beneficiaries already pointed out, all of the corpus of my estate of every kind shall go to and be distributed to my said children and

grandchildren hereinabove named and pointed out, and in the proportions in which they receive the income as already directed, and with the same conditions and with the same limitations and survivorships already pointed out with respect to the receipt and distribution of the income during the term of said trust.''

The final Article, the Seventh, excuses the trustee from giving bond unless requested in writing by a majority of the beneficiaries and excuses it from making reports to any court.

By the codicil dated March 20, 1928, the testator provided as follows:

''With respect to the legacies therein given to my daughters, Mrs. C. M. Mitchell and (Mrs.) Mary L. Jones, and to my grandchildren therein named, and which are placed in trust with the Bankers Trust Company of Knoxville, Tennessee, as therein set out, I hereby declare said bequests to have been made and to be made by me to be for the support and maintenance of each of the persons therein named, and said bequest to the Bankers Trust Company as Trustee is for that specific purpose and no other, and neither the said Trustee nor the said beneficiaries, or either of them, shall have the power or authority to divert said property and moneys from the said appointed purpose; and the said Trustee shall have the power to see that the income going to said beneficiaries is expended for said purposes and for no other and during the term of said trust neither of the said beneficiaries shall have the power or authority to alienate or encumber the same, and the said principal fund and the income derived therefrom shall not be subject to the claims of any creditors of said beneficiaries, and shall not be subject to execution, levy or sale.''

After holding that the will created a spendthrift trust, the chancellor concluded that it was the intention of the testator that the 15% of the estate devised and bequeathed to the grandson David Sullins should revert to the estate upon the latter's death without descendants during the term of the trust, and he decreed accordingly.

This conclusion is challenged by the complainants with much skill and ingenuity. Their position as to this and in other respects is succinctly stated in the brief filed in support of their assignments of error. They insist that (1) "the question as to what the will provides for Mrs. David Sullins is answered by construing its provisions for Mrs. Samuel Luttrell Sullins; (2) the interests of the beneficiaries, including David Sullins, were vested interests; (3) the will contains no provision that the share of a grandchild dying during the term of the trust without descendants shall revert to the trust estate; (4) under Article Fourth of the will, David Sullins' widow received the absolute right to 15% of the income and a fee simple title to 15% of the estate, both of which passed to the complainants upon her death; (5) if, contrary to the last proposition above, the Court concludes that the will did not direct the vesting of said 15% interest in David Sullins' widow, then the interest of David Sullins passed by his intestacy, and not by the will, and the cause should be remanded with directions that the nature of the assets of the estate be disclosed so that the law governing David Sullins' intestacy may be applied. This insistence is made secondarily to the proposition immediately above, which is not waived in any respect."

The evidence discloses that the relation between the testator, Samuel B. Luttrell, and the members of his family, including his grandson David, was one of mutual love and affection; that they were in the main a closely

knit group who were devoted to each other. With the exception of the grandson David, they apparently were and are substantial and respected citizens with unblemished reputations. So far as appears, the testator never knew Dixie Anne Davis. As we have said, she and David were not married until some years after his death.

The parties apparently agree that the construction to be given the provision in Article Fourth for the wife of the grandson David is controlled in large measure by the construction of the provision immediately preceding it for the wife of the grandson Samuel. The defendants contend mainly that the wife was to take no interest unless there were children. In other words, that the existence of children being a condition precedent to the gift to the wife and there having been no children born to Dixie and David, the wife took nothing.

We do not think this contention is tenable. Here, as elsewhere, the duty is to discover the intention of the testator as expressed by the language he used and give effect thereto. We think it clear that the dominant purpose of the provision embraced within the exception was to provide for the wife in the event she survived the death of her husband. The phrase, ''share equally with their children'', was, we think, employed to designate the measure of the interest the wife was to receive. We say this because Samuel Sullins is mentioned by name and when the will was drawn and at the time of the testator's death he had living children. There was no point in making the exception at all unless it was to provide for the wife. The children were already provided for by the first clause of the sentence of which the exception is part. Having made this provision for Samuel Sullins' children in the first clause, it was the natural thing that the testator should have then made

provision for their mother. We can discover nothing in the will construed as a whole in the light of the circumstances that would indicate that the intention of the testator was to exclude Samuel Sullins' wife in the event he died childless during the term of the trust. The context considered in the light of the circumstances indicates the contrary.

This conclusion, we think, is fortified by the fact that the provision for the wife not only related to the income but to the corpus of the estate ''as hereinafter directed'', the language being, ''she shall be entitled to share equally with their children in the income arising from the estate or the corpus thereof as hereinafter directed.''

Furthermore, the only condition annexed to the provision for the benefit of the wife of David Sullins was his death during the term of the trust, leaving his wife surviving him. The failure to mention children in this provision, considered in connection with the opening word, ''like'', in describing the provision, indicates that the dominant purpose of the preceding clause to which that word referred was to provide for the wife, the testator realizing, no doubt, that any children David Sullins might have were provided for by the first clause of the preceding sentence. The word, ''like'', does not mean identical, and in view of the context and the domestic situation of the two grandsons as it then existed, was an apt word. In the one clause, the testator was providing for a wife of a grandson who was already in existence and who also had existing children, and in the other he was providing for the spouse of a grandson who then had neither wife nor children but who, he realized, might possibly have both, and manifestly it

was his intention to put the potential wife on an equality with the existing one to the extent indicated.

The next question is whether the phrase, "any child or children", in the second clause of the first sentence of Article Fourth, reading, "in case of the decease of any child or children without descendants, the income shall become a part of the trust estate to be distributed pro rata to the remaining beneficiaries", should be interpreted to include "grandchildren." The defendants maintain that it should be so interpreted, which the complainants deny. We think the defendants are right. In the first clause of the sentence, the testator had in mind the event of the death of a "child or grandchild", leaving descendants. The phrase, "if any," immediately following the words, "child or grandchild," conclusively shows that the testator definitely had in mind an alternative. It was a natural thing, therefore, that he should immediately and in the same sentence proceed to provide for that alternative, namely, the death of one of those he had just mentioned without descendants, and this is what we think he undertook to do in the second clause of the sentence. Unless the phrase "child or children" is construed to include grandchildren, then the possible alternative situation, which obviously the testator had in mind, was only partly provided for. The view indicated is fortified by the use of the word "or," in the phrase, "any child or children". The implication seems clear that in using the word, "children", the testator had in mind an alternative to that contemplated by the immediately preceding words, "any child". Manifesly, he was undertaking to provide for two different events. Again, unless it be construed to mean "grandchildren", then the phrase, "or children", was surplusage, because the

event contemplated by the death of "children without descendants" had already been covered by the preceding words, "in case of the decease of any child." It is an elementary rule of construction that all words of an instrument must be given effect if this can be done consistently with the intention gathered from the whole instrument. Rinks v. Gordon, 160 Tenn., 345, 349, 24 S. W. (2d) 896. In the present instance, this can be done only by construing the phrase under consideration to include grandchildren.

▆▆ In reaching this conclusion we are not unmindful of the general rule that the words, "child" and "children", do not in their natural sense and proper signification include grandchildren. Hoggatt v. Clopton, 142 Tenn., 184, 217 S. W., 657, and cases cited. But it is equally well settled that they will be given an extended signification where it is required by the context and is necessary to give effect to the intention gathered from the instrument as a whole. 14 C. J. S., 1106 et seq.

▆▆ The next question is, to what is the proviso in the closing words of the first sentence of Article Fourth an exception, the first clause of the sentence, or the second clause, or both? Since we have held that the sole purpose of the proviso was to make provision for the wife of Samuel Sullins, it logically follows, we think, that it was intended as an exception to the first clause. The exception merely added the wife to the class created by the first clause and composed of the descendants of a child or grandchild. Only by this construction can any effect be given to the provision that "in case of the decease of any child or children (grandchildren) without descendant the said income shall become a part of the trust estate to be distributed pro rata to the remaining

beneficiaries'', in the event of the death of Samuel Sullins or David Sullins during the term of the trust, leaving a wife but no descendants. It should be said just here, however, that under the construction we have adopted, the provision that the income should become a part of the estate, etc., in such event, is necessarily subject to the rights of the respective wives of Samuel Sullins and David Sullins as hereinafter determined.

It follows that children, unborn and in esse, and the wives of the two grandsons, Samuel and David, respectively, are to be regarded as substitutional beneficiaries of the respective interests given the grandsons. This means that, having survived her husband without children, Dixie Anne Sullins took his interest as a substitute for him.

So, for the reasons hereinafter elaborated, we think that the nature and extent of her interest must depend on the characteristics of that of her husband, David Sullins, notwithstanding a contention by the complainants to the contrary. Was the latter a vested, transmissible interest in the income or the corpus, or in both, as the complainants strongly contend?

It has often been said, and truly, that precedents are of little value in the construction of wills because no two are identical, and we have found this dictum exceedingly apt in our investigation of the present case. Hadley v. Hadley, 100 Tenn., 446, 45 S. W., 342; Jones v. Hunt, 96 Tenn., 269, 376, 34 S. W., 693.

Nevertheless the decisions have established certain principles defining the legal consequences of gifts of a similar character, and it is expedient to first ascertain what those pertinent to the present case are. Preliminarily and by way of clarification it is proper to say it is conceded that the trust created by the will was an active

one and it is asserted that in so far as the children and grandchildren are concerned it was a spendthrift trust. It is also well to note there is no attack upon the validity of the will or any provision of it. We are concerned only with its construction.

While, as will presently appear, we think the trust involved is something more than a spendthrift trust as commonly understood, it is pertinent to consider trusts of that character.

█ There is much learning in the books concerning spendthrift trusts and incidents of the estates of the beneficiaries therein. A leading case is the celebrated one of Jourolmon v. Massengill, 86 Tenn., 81, 5 S. W., 719, which has been often cited and much discussed. The doctrine of that case is the chief reliance of the defendants in this one. The Jourolmon case aligned this jurisdiction wtih the weight of authority in this country upholding the validity of spendthrift trusts, notwithstanding that, as has been subsequently pointed out, the real basis of the decision of the particular issue as it arose in that case was the Act of 1832, Chapter 11, now contained in Code, Section 10353. White v. O'Bryan, 148 Tenn., 18, 39, 251 S. W., 785; Menken v. Brinkley, 94 Tenn., 721, 31 S. W., 92; Tramell v. Tramell, 162 Tenn., 1, 26, 32 S. W. (2d), 1025, 35 S. W. (2d), 574.

█ Even so, the court, in the Jourolmon case, after a learned and exhaustive discussion, gave definite expression to its views with respect to the characteristics and validity of spendthrift trusts and the nature and incidents of the estates created thereby. These have not been disapproved in any subsequent case, and manifestly having been announced after careful consideration and with the deliberation and purpose, they are to be regarded as authoritative precedents controlling in this

jurisdiction, especially in so far as the lower courts are concerned, even though not necessary to the particular decision. Taylor v. Taylor, 162 Tenn., 482, 489, 40 S. W. (2d), 393.

In the Tennessee Law Review, Vol. 16, pages 38-46, there is a learned and discriminating discussion of the development of the doctrine of spendthrift trusts in this State by the distinguished jurist and lawyer, the late Thomas H. Malone, Esquire, who, as special justice of the Supreme Court, also wrote the opinion in White v. O'Bryan, supra. This article is referred to with approval in Sternberger v. Glenn, 175 Tenn., 644, 137 S. W. (2d), 269, and will be found profitable to those who have occasion to pursue the subject.

The interpretation of the views expressed in Jourolmon v. Massengill by subsequent cases is that by virtue of Code, Section 10353 an active trust within the purview of that enactment takes on the characteristics and immunities appertaining to a spendthrift trust, as that phrase is commonly understood, quite apart from any restrictions or lack of them in the instrument creating the trust, in so far as the rights of creditors are concerned, but that neither the statute, nor the usual provisions creating a strictly spendthrift trust where present, will prevent the immediate vesting of an equitable, transmissible estate in the beneficiaries of the trust unless the language of the will expressly or impliedly manifests a contrary intention on the part of the testator. Tramell v. Tramell, 162 Tenn., 1, 26, 32 S. W. (2d), 1025, 35 S. W. (2d), 574; Patton v. Winters, 20 Tenn. App., 600, 101 S. W. (2d), 708; Williams, Com'r v. McFarland, 162 Tenn., 468, 37 S. W. (2d), 116; Henson v. Wright, 88 Tenn., 501, 12 S. W., 1035; Winters v. March, 139 Tenn., 496, 202 S. W., 73.

However, the line of cases which support this view also leave no doubt that an active trust can be created wherein the beneficiary takes no transmissible equitable interest in the estate and none in the income until it is paid to him, and no doubt that one was held to have been so created by the will under the consideration in the Jourolmon case, notwithstanding that, as we say, the real basis of the decision there was the statute now contained in Code, Section 10353. Tramell v. Tramel, supra.

The gift was to a trustee for the use and benefit of the testator's son, with a provision that no part of the property was to be subject to any liability of the son, and with the further provision that he was not to sell the same nor any part thereof, but "may use the rents and profits for his support and that of my (testator's) wife, E. H. Massengill, but he shall have the right to dispose of the same by last will and testament." [86 Tenn. 81, 5 S. W. 720.]

Construing this provision, the Court said:

"The son is given power by last will to designate the takers of the remainder estate, but he should have no power to sell or use the corpus of the estate. In default of an appointment by last will, there being no other disposition made, it is clear that upon the death of the son the *estate would descend to the heirs of the testator, not the heirs of the son.*"

In the recent case of Tramell v. Tramell, 162 Tenn., 1, 32 S. W. (2d), 1025, 35 S. W. (2d), 574, 576, the court, in distinguishing Jourolmon v. Massengill, expressly pointed out that by the specific limitation upon the son's "use and benefit" intended to be provided for, by the additional provision: "nor is he to sell the same, nor any part thereof, but may use the rents and

profits for his support and that of my wife, E. H. Massengill, but he shall have the right to dispose of the same by last will and testament'', the testator manifested an intention to provide for the support of his son and his own widow at all events and in all contingencies, and that the son was given no absolute right to the income from the trust during his life but took the limited right to use the income for the support of himself and his mother. It was also specifically pointed out that ''the will creating the trust was so worded as *to withhold from the beneficiary any interest or estate in the trust property*, except the power to dispose of it by will''. (Emphasis ours.)

By the will under consideration in Vines v. Vines, 143 Tenn., 517, 226 S. W., 1039, the testator bequeathed to each of two sisters ''for the period of ten years, if they or either of them should live so long, a sum sufficient for their support, care, maintenance, and comfort,'' the trustee ''is to be the judge of what monthly allowance is proper and necessary for each; and he is directed to pay the same promptly and regularly.'' The will further provided that the trust property which consisted of two farms should not be sold within ten years after the testator's death, but should be managed during that period by the trustee and the revenue, after the payment of expenses, ''shall be employed, so far as necessary, to the payment of the bequests to my sisters.'' Provision was then made for a distribution of the proceeds of a sale to be thereafter made.

The question before the court was whether the trust could be terminated by agreement of the parties, including the two sisters, upon a showing that a postponement of the sale of the two farms for 10 years would result in a great loss to all of them. The conclusion

was that the sisters took no vested interest in the estate, but would become vested with such funds only after the trustee in his discretion saw proper to pay them, and hence their agreement to terminate the trust was ineffectual and could not be enforced.

In the Jourolmon case, and again in Vines v. Vines, the court quoted from Perry on Trusts, Section 386-A, in support of the conclusion reached as to the nature and duration of the respective estates of the beneficiaries of the wills under consideration. In that text, it is said, inter alia, that ''a trust may be so created that no interests vest in the cestui que trust; consequently such interest cannot be alienated, as, where property is given to trustees to be applied in their discretion to the use of a third person, no interest goes to the third person until the trustees have exercised this discretion. So [continues the author], if property is given to trustees to be applied by them to the support of the cestui que trust and his family, or to be paid over to the cestui que trust for the support of himself and the education and maintenance of his children.''

In the 7th edition of the text, section 386-A, page 651 it is said: ''The American doctrine rests upon the ground that a right to receive income of a trust fund is not necessarily an interest in the fund itself.''

The same view is expressed in Henson v. Wright, 88 Tenn., 501, 507, 12 S. W., 1035, 1036, in an opinion by Justice Lurton who also prepared the majority opinion in the Jourolmon case: ''A trust may be so created'', said the Court, ''that no interest vests in the beneficiary, as where it is limited to the support and maintenance of the beneficiary, and he is prohibited from alienation or anticipation. So where the income is to be paid over only in the *discretion of the trustee, or when it can only*

*be applied for a special use,* such as education or support.'' (Latter emphasis ours.)

Some of the cases emphasize a distinction between trusts that are purely spendthrift trusts and those for support. Creditors are barred from reaching the beneficiaries' interest in the former by the restrictions expressed in the instrument, whereas in the latter the very nature of the beneficiaries' interest is the thing that operates as a bar. In re Keeler's Estate, 334 Pa., 225, 3 A. (2d), 413, 121 A. L. R., 1301; Note 119 A. L. R., 8, 21, 22; Restatement of the Law of Trusts, Sec. 154, Comment A.

Again, it is said that, ''A distinction has been made between the gift of the whole or a definite part of the income of a trust fund for the support of the beneficiary and a mere right to support out of the income. In the former case it has been held that the beneficiary has an alienable interest, the words 'for support' being construed as merely stating the reason for the gift and not necessarily showing an intention to limit the beneficiary's power of alienation or anticipation''. Perry on Trusts and Trustees, Sec. 386-A, page 650; Slattery v. Wason, 151 Mass., 266, 23 N. E., 843, 7 L. R. A., 393, 21 Am. St. Rep., 448; and cf., Anderson v. Hammond, 70 Tenn., 281, 31 Am. Rep., 612.

The distinction that is pertinent here is, that restrictions creating a pure spendthrift trust—that is, mere restraints upon alienation and anticipation, do not necessarily operate to prevent the vesting of an equitable estate in fee in the beneficiaries, whereas the contrary may be true of restrictions strictly limiting the use of the income or corpus to support, or vesting the trustee with a discretion as to its application to the appointed purpose. Jourolmon v. Massengill, supra;

Henson v. Wright, supra; Vines v. Vines, supra; Tramell v. Tramell, supra. See also, Graham v. More (Mo. Sup.), 189 S. W., 1186; Perabo v. Gallagher, 241 Mass. 207, 135 N. E., 113; Slattery v. Wason, supra; Barnes v. Dow, 59 Vt., 530, 10 A., 258; Parker Holmes & Co. v. Bushnell, 80 Conn., 233, 67 A., 479; Leverett v. Barnwell, 214 Mass. 105, 101 N. E., 75; True Real Estate Co. v. True, 115 Me. 533, 99 A., 627.

█ So, as we have said, it must be regarded as settled that a trust can be created under the terms of which the beneficiary takes no equitable interest in the corpus and none in the income until it is paid to him. We thus come to the question of whether the trust in the present case was of that character, in so far as the grandson David was one of the beneficiaries. Since it is lawful to create such a trust, the cardinal inquiry upon this phase of the will, as upon all others, is to discover from the language used, considered in the light of the circumstances, the intention of the testator.

█ It is important to say that we think it a mistake to regard this trust as purely a spendthrift trust and no more. It is primarily and predominantly a trust for support and maintenance. In the first place the circumstances of the parties named in the will, the grandson David only excepted, tend strongly to negative the idea that the testator's primary purpose was to fence the property off from the creditors of the beneficiaries. As said heretofore, with the exception of David, they were all substantial, respectable citizens, who, so far as anything in the record indicates, stood in no need of such protection. But altogether apart from this, it was settled law in this jurisdiction at the time the will was drawn and at the time the testator died, that, having created an active trust, the statute now contained

in Code, section 10353, barred the creditors of the beneficiaries without the restrictions in the will. Manifestly, the document was prepared by a lawyer who presumably knew this, and hence, we say, the only reasonable conclusion is that the primary, predominate purpose in creating the trust and imposing the restrictions and fixing the limitations was not to protect the property against creditors but to have it held together under the management and discretion of the trustee for the longest permissible period as the most effective means of preserving the corpus and providing support for the beneficiaries in whole or in part from the income.

But it is appropriate to determine whether the stipulation with respect to the use of the income for the support of the beneficiaries were merely descriptive of the reason for the gift, or whether, construed as a whole, the pertinent provisions conferred a right to support out of the income with a discretion vested in the trustee in that regard. Whatever may have been true with respect to the will as originally published, we think the first codicil leaves the suggested question in no doubt.

With respect to the gifts to the children and grandchildren, the testator not only expressly declared in the codicil ''said bequests'' to have been made ''. . . for the support and maintenance of each of the persons therein named, and said bequest to the Bankers Trust Co. as Trustee is for that specific purpose'', but, to make assurance doubly sure, he added the phrase, ''and no other'', and then provided that ''neither the said trustee or said beneficiaries or either of them shall have the power or authority to divert said property and monies from said appointed purpose.'' He then vested in the trustee the power ''to see that the income going

to said beneficiaries is expended for said purpose and for no other''; and followed this with the provision that ''during the term of said trust neither of said beneficiaries shall have the power or authority to alienate or encumber the same'', referring to the income, and added that said principal fund and the income derived therefrom shall not be subject to the claims of any creditors of said beneficiaries, etc.

It is clear, we think, from these provisions that the stipulations relative to the use of the income for the support and maintenance of the beneficiaries were not merely descriptive of the testator's reasons for making the gift, a point upon which some of the cases in the books turn, but that the trustee was vested with full authority of exercising supervision over the fund even after it reached the hands of the beneficiaries, to see that it was expended for the purposes stated, ''and for *no other*''. If any doubt remained it was removed by the provision that neither the trustee nor the beneficiaries should have the power or authority to divert the funds from ''the said appointed purpose.'' By virtue of this provision, if a beneficiary undertook to spend the funds or any part of them for any other purpose, he would be guilty of a breach of trust; for there was in the view of a court of equity as complete a trust in him or her to apply the funds for the purpose specified as there was in the trustee. See, Garland v. Garland, 87 Va., 758, 13 S. E., 478, 13 L. R. A., 212, 24 Am. St. Rep., 682; Perry on Trusts, Sec. 386-A.

██ In the present case the charge laid upon the trustee to see that ''said property and monies'' are not diverted to any purpose other than that of the support of the beneficiaries and the power given it ''to see that the income going to said beneficiaries is expended for

said purposes and for no other'', by necessary implication committed to the judgment of the trustee the question of what was reasonably necessary for support of the beneficiaries within the limitations of the percentage of income fixed for that purpose in the case of each of them. The inherent nature of the duty and authority thus conferred upon the trustee necessarily limited its authority to distribute the income to such amount as was reasonably necessary to accomplish the appointed purpose, not to exceed in any event the respective amounts specified in sub-section 3 of Article First. No other construction is consistent with the provisions of the codicil expressly limiting the purpose for which the income might be used and laying upon both the trustee and the beneficiaries the duty to see that it was used for that purpose and no other.

This is in accord with the distinction recognized in some of the cases in the nature and extent of the interest of one to whom there is an express gift of the income and that of one who is given the mere right to receive it. Perry on Trusts, Sec. 386-A; see generally, Staub v. Williams, 73 Tenn., 458.

Our conclusion is that apart from the presently to be considered effect of the language of Article Sixth disposing of the corpus upon the termination of the trust, the restrictions and limitations on the use of the income brings the case squarely within the doctrine of Jourolmon v. Massengill as interpreted in Henson v. Wright, supra, Vines v. Vines, supra, and Tramell v. Tramell, supra.

This is the only conclusion possible that is consistent with the stipulation in Article Third that those designated ''during the term of the trust shall have no interest therein except to receive the rents and profits herein

provided as going to them for their support through said Trustee.''

It follows that the grandson David took no vested, transmissible interest in the income, and it likewise follows that the right conferred upon him to receive the designated part of the income did not operate to give him a vested, equitable estate in the corpus under the rule reiterated in Tramell v. Tramell, 162 Tenn., 1, 19, 20, 32 S. W. (2d), 1025, 35 S. W. (2d), 574, that a devise or bequest of the rents and profits of property placed under a trust is, unless limited by the will, equivalent to a devise or bequest of the property itself. Jourolmon v. Massengill, supra; Henson v. Wright, supra; Vines v. Vines, supra; Dooley v. Penland, 156 Tenn., 284, 300 S. W., 9.

We next consider whether Article Sixth providing for a disposition of the trust property upon the termination of the trust is of any avail to the complainants. The question is whether the language of that article created a vested, equitable interest in the corpus in the grandson David. Within the limit fixed by the rule against perpetuities this also is the question of what the testator intended. Rinks v. Gordon, 160 Tenn., 345, 24 S. W. (2d), 896, and cases cited. This being true, we think the stipulation in the will denying the children and grandchildren any interest during the term of the trust except the right to receive the rents and profits for their support furnishes a conclusive answer. It seems to us there could hardly be a more definite manifestation of intention and since, to give effect to it would not be in contravention of any fixed rule of law or public policy, we perceive no reason why it should not be done. Cf. St. Louis Union Trust Co. v. Bassett, 337 Mo., 604, 85 S. W. (2d), 569, 101 A. L. R., 1266; and

Loud v. St. Louis Union Trust Co., 298 Mo., 148, 249 S. W., 629, 636.

If this clearly expressed intention needed reinforcement, it is, we think, to be found in the inferences reasonably to be drawn from the fact that, annexed to the clause in Section 5 of Article First fixing the term of the trust at a period of twenty-five years from the testator's death, there is a proviso that "said trust shall not extend further than twenty-one years and nine months after the death of the last survivor of said three (3) lifetime beneficiaries, to-wit, my wife and two sisters."

Article Sixth, disposing of the corpus of the estate at the termination of the trust, read in connection with this proviso, seems to show conclusively that the testator definitely had in mind not merely the time when those designated would come into the possession or enjoyment of their respective estates but the time when the interest in the corpus that had been withheld by the stipulation in Article Third should vest. See generally: Rinks v. Gordon, 160 Tenn., 345, 24 S. W. (2d), 896, and Forrest v. Porch, 100 Tenn., 391, 45 S. W., 676. Obviously, the proviso annexed to the clause fixing the term of the trust was designed to insure against a violation of the rule against perpetuities. If it had been the testator's intention that an equitable estate in the corpus should vest immediately upon his death, there would have been no point in expressly making that provision. See Tramell v. Tramell, supra.

The decisions which we think support, in principle, the conclusions we have reached, proceed upon the theory that the owner of property has a right to make any disposition of it he desires so long as he violates no rule of public policy. This view has taken deep root in this country and there is now no substantial dis-

sent from it. There is certainly none in this State since the decision in Jourolmon v. Massengill. The Massachusetts court has dealt frequently with this underlying principle beginning with the leading case of Broadway Nat. Bank v. Adams, 133 Mass., 170, 43 Am. Rep., 504. Others in that jourisdiction treating the principle include Claflin v. Claflin, 149 Mass., 19, 20 N. E., 454, 5 L. R. A., 370, 14 Am. St. Rep., 393; Young v. Snow, 167 Mass., 287, 45 N. E., 686.; and Dunn v. Dobson, 198 Mass., 142, 84 N. E., 327.

In its bearing upon the question under consideration in the present controversy, it is inescapably significant in this jurisdiction that as early as Jourolmon v. Massengill and as late as Tramell v. Tramell, the Adams case was cited with obvious approval of its basic concepts.

It is true that the cases just cited deal mainly with restrictions peculiar to strictly spendthrift trusts, but the principle announced and the supporting line of reasoning apply no less forcefully to restrictions designed to limit the use of property exclusively to the support and maintenance of designated beneficiaries, and, for that matter, to any kind of restrictions that the owner of the property sees fit to impose, so long as they violate no rule of public policy.

The complainants have filed two elaborate and exceptionally strong briefs in which there is to be found a discriminating analysis of the authorities that it is insisted require a construction of the will in accordance with their contentions. Those chiefly relied upon are Winters v. Marsh, 139 Tenn., 496, 202 S. W., 73; Patton v. Winters, 20 Tenn. App., 600, 101 S. W. (2d), 708; Tramell v. Tramell, 162 Tenn., 1, 31, 32 S. W. (2d), 1025, 35 S. W. (2d), 574; Williams v. McFarland, 162 Tenn., 468, 37 S. W.

(2d), 116; Anderson v. Lucas, 140 Tenn., 336, 209 S. W. 989; Underwood v. Dismukes, 19 Tenn., 299; Maynor v. Vaughn, 159 Tenn., 281, 17 S. W. (2d), 910. We are not inappreciative of the efforts of counsel in briefing these authorities for our assistance; but we have examined them all and think it sufficient to say that they cannot be regarded as controlling in the construction of the will before us for the reason, among others, that in none of them did there appear, as does here, an unmistakable manifestation of an intention that during the term of the trust the beneficiaries should have no interest in the trust property other than the right to receive the income.

In Anderson v. Lucas, supra, cited by complainants, the ruling was that the testator is presumed to intend that the beneficiaries of a trust take an equitable interest of precisely the same extent as the legal interest expressly vested in the trustees in the absence of expressions of a contrary intent, thus clearly implying that the presumption is successfully rebutted when such expressions are present, as in this case.

In Winters v. March, 139 Tenn., 496, 202 S. W. 73, one of the cases strongly relied upon by complainant, the term of the trust was not specified. The holding was that under the particular language there involved, the beneficiaries took a vested transmissible interest. But this was not by virtue of the direction that the income of the trust property be devoted to their support but because "the testator devised his property to them, without qualification, except that it is left in equal shares and in trust." Patton v. Winters, 20 Tenn. App., 600, 101 S. W. (2d), 708, 709, construed the same will and merely followed the decision in Winters v. March.

For the reason already stated, we think none of the other cases relied upon by complainants are in point.

It follows that there is no view of this case in which we think it can be said that the grandson David took such an interest in either the income or the corpus of the fund that it passed to his representatives under the statutes of descent and distribution.

We come now to the question of whether, under the terms of the will, Dixie, as a surviving wife of the grandson David, took a vested, transmissible interest in the income or corpus or both.

The complainants strongly insist that the restrictions and the stipulation contained in Article Third of the will and the codicil that we have held determinative with respect to the nature and extent of the interest given the grandson David, apply only to the gifts to the children and grandchildren, and this contention presents one of the principal questions in the case. It is based mainly on the fact that the restrictions found in the codicil hereinabove quoted are immediately preceded by the language, "with respect to the legacies therein given to my daughters, Mrs. C. M. Mitchell and Mrs. Mary L. Jordan, and to my grandchildren therein named, etc."

Considering the will as a whole in the light of the dominant purpose, we think this language was employed for the purpose of distinguishing, in the connection which followed, the "legacies" given the testator's daughters and grandchildren, grouped in sub-section 3 of Section 6 of Article First, from the gifts to his wife and sisters which are set apart to them in separate sub-sections 1 and 2 of section 6 of that article and which in very material respects are on a substantially different basis from the rights conferred upon the daughters and grandchildren. In other words, we think the testator used this language for the purpose of indicating that the provisions for his wife and sisters and not those for the sub-

stitutional beneficiaries provided for in Article Fourth, were excluded from the restrictions which followed that language. This is the only conclusion consistent with the scheme of the will considered as a whole. It would be, we think, illogical to conclude that by that language the testator intended to single out the gifts to his children and grandchildren, who were without doubt among the principal objects of his affection, for the purpose of making such a substantial and unnatural distinction in favor of the substitutional beneficiaries provided for in the third article, some of whom were at the time wholly unknown and mere potentialities.

We think the fallacy of the complainants' position generally upon this phase of the case is that it fails to take into consideration the fact that the gift to the potential wife of the grandson David was not a substantive gift but a substitutional one, or rather that she was to take as a substitutional beneficiary.

 With reference to substitution by provisions in a will, the text of Rood on Wills, sec. 680, is:

"Substitution may relate to the beneficiaries or to the property given. Gifts are said to be substitutional: 1, when a devise or bequest is made to one, several, or a class, and later, in the same sentence, in another connection, or in a later will, it is provided, that some other or others shall take what was given to the donees first named, (a) if a specified event shall happen, or (b) because of some change that has occurred since the first gift was made; 2, when a devise or bequest is made to one or many, and later in the same or some other will, somthing else, or a different estate in the same thing, is given as a substitute for the first gift."

 In Section 699 of that text it is said:

"Substitutional gifts are subject to all the incidents of the originals, wheher the substitution is as to the property or as to the beneficiaries, whether the incident is advantageous or prejudicial to the donee, and whether it attached to the original gift particularly or to the whole clause in which it was made, and though the incident is not mentioned in connection with the substitute."

See 69 C. J. 358, sec. 1370.

Though the substitution involved in Brown v. Cannon, 40 Tenn., 354, related to property rather than to beneficiaries, we think the case is in point in principle. See also, Ewin v. Park, 40 Tenn., 713, applying the rule; and Vancil v. Evans, 44 Tenn., 340; Fox v. Fox, 102 Tenn., 77, 50 S. W., 765, distinguishes these cases, but recognizes the analogous principle.

Compare: St. Louis Union Trust Co. v. Bassett, 337 Mo. 604, 85 S. W. (2d) 569, 101 A. L. R. 1266; McCoy v. Houck, 180 Ind., 634, 99 N. E., 97; Leighton v. Leighton, 193 Iowa, 1299, 188 N. W., 922, 923.

It is perhaps true that most of the cases we have examined dealing with this particular question or analogous questions, involve wills wherein the intention that the restrictions placed on the original shares should extend to the accrued shares, or should extend to the interest of the substitutional beneficiary, is definitely expressed, but all of the authorities are agreed that the question is one of intent and we apprehend that intention with respect to this particular matter, no less than to any other, may be found in the necessary implication of the language of the will construed as a whole and in the dominant scheme and purpose of the testator. Page on Wills, 2d Ed., sec. 1032, and secs. 811 and 812; Rozell v. Thomas (Tenn. Ch. App.), 39 S. W. 350, 351; Gray v. Ward (Tenn. Ch. App.), 52 S. W. 1028.

240

"That which is clearly implied", said the Court in Epperson v. White, 156 Tenn., 155, 299 S. W., 812, 814, 57 A. L. R., 601, "is as plainly declared as that which is expressed."

It is true, however, that this means the intention discoverable from the language of the will, or fairly inferable therefrom, considered in the light of the surrounding circumstances. The court cannot give effect to an intention though morally certain it existed in the testator's mind, unless it is to be found in the language used, either expressly or by implication. Fox v. Fox, 102 Tenn., 77, 50 S. W., 765; Martin v. Hale, 167 Tenn., 438, 71 S. W. (2d), 211; Nichols v. Todd, 20 Tenn. App., 564, 101 S. W. (2d), 486; Cannon v. Ewin, 18 Tenn. App., 388, 400, 77 S. W. (2d), 990. But the intention is not to be ascertained from any separate portion of the will considered apart from the rest. It is to be arrived at from a consideration of the document as a whole. Fidelity Trust Co. v. Service Laundry Co., 160 Tenn., 57, 22 S. W. (2d), 6; Maynor v. Vaughn, 159 Tenn., 281, 17 S. W. (2d), 910. It is equally settled that in a construction of an ambiguous provision, that should be adopted if reasonable which will sustain and carry out, rather than defeat, the intention of the maker. Tramell v. Tramell, 162 Tenn., 1, 32 S. W. (2d), 1025, 35 S. W. (2d) 574. That intention must be gathered from the whole instrument, and whatever appears to be the dominant and controlling intent must govern even if in conflict with some word, phrase or expression, which, taken alone and separately, might lead to a different conclusion or interpretation. The arbitrary and technical meaning of the words must yield to the lawful intention of the testator when ascertained. East and Collins v. Burns, 104 Tenn., 169, 56 S. W. 830.

When one controlling or dominant purpose of a testator is expressed, it is the duty of the court to so construe his will as to effectuate this major intention, and to construe all subsidiary clauses so as to bring them into subordination. Especially is this rule applicable when equality is the primary intention of the testator. East and Collins v. Burns, supra; Mears v. Wharton, 5 Tenn. Civ. App., ,329; 1 Page on Wills (2 Ed.), sec. 812. Sometimes the letter must yield to the spirit. Hadley v. Hadley, 100 Tenn., 446, 453, 45 S. W., 342.

There can be no doubt about the dominant intention of the testator in creating the trust in the present case. As we have said, after providing for his wife and two sisters it was to make what he conceived to be the most effective provision possible for the support of those others upon whom he bestowed his bounty. He manifestly thought that this purpose could be more effectively accomplished by keeping the property under the management of a trustee for the longest permissible time, without the beneficiaries having any interest therein. The language of the will leaves no doubt about this. One of the primary purposes of the quoted codicil manifestly was to emphasize the fact that the trust was created primarily for the support and maintenance of the children and grandchildren. It is therein expressly so stated, not only with respect to the "legacies" given the children and grandchildren, but it is expressly said that "the said bequest to the Bankers Trust Company as trustees is for that specific purpose and no other."

As already indicated, it is our view that, in determining the interest intended to be conferred upon the beneficiaries, the directions, powers and duties laid upon the trustee with respect to the income while not the only ones are important factors. They inhere in the income

and, considered in connection with the whole will, give character to the rights conferred upon the beneficiaries. The duties of the trustee with respect to disposing of the income and its application to the support of the beneficiaries and to no other purpose, necessarily limit the interest of those who are to receive it.

The trustee is not only to distribute the income during the term of the trust "as hereinafter specifically directed", but to distribute it "to the parties hereinafter specifically directed", excluding by necessary implication a right to distribute any part of it to any person not specifically designated either by name or description.

The interesting reasoning in the opinion of the Circuit Court of Appeals, 8th Circuit, in the case of Jones v. Harrison, 7 F. (2d), 461, indicates that restrictions on a gift may arise by implication from such a direction to a trustee and the factum of the trust. See also, Commerce Trust Co. v. Bayles (Mo. App.), 273 S.W. 759; Barnes v. Dow, 59 Vt., 530, 10 A., 258; 25 R. C. L., 1268, and Note; 13 L. R. A., 212.

As was said by the Supreme Court of the United States in Eaton v. Boston Safe Deposit & Trust Co., 240 U. S., 427, 36 S. Ct., 391, 392, 60 L. Ed., 723, with respect to the rule in Massachusetts upholding the validity of spendthrift trusts, the courts of that state treat restrictions creating such a trust "as limiting the character of equitable property and inherent in it." This is no less true, we think, of the restrictions to be found in a trust exclusively for support, such as we have in this case.

If the complainants' contention that the widow Dixie took her husband's "share" of the estate free from the limitations and restrictions affixed to it in the gift to him, be valid, then she took not only the interest he had in the income and corpus but a far greater interest in both. We

say this because, under the rule announced in Tramell v. Tramell, supra, Davis v. Williams, 85 Tenn., 646, 4 S. W., 8, and other cases herein cited, there being no gift over upon the death of a surviving wife of the grandson David, she took a vested, transmissible interest in the income and a vested, equitable interest in the corpus that was likewise transmissible. In short, in that event, instead of succeeding to the interest given her husband, she would be taking an interest that he never had and one that the testator both expressly and impliedly said that he should not have during the term of the trust.

Not only is there no such intention expressed in the will, either directly or by necessary implication, but just the contrary. To uphold that contention would be to defeat, in substantial part, the dominant scheme of the testator. The result would be that persons of whom the testator never heard would enjoy a very substantial part of his estate, excluding from that portion those who were intended to be the direct and primary objects of his bounty and for whose welfare it is manifest he was most solicitous.

As was said by Chief Justice Gibson in Commonwealth v. Duffield, 12 Pa. 277, and quoted in Mayberry v. Redmond, 169 Tenn., 190, 193, 83 S. W. (2d), 897, "There is such flagrant injustice in applying the bounty of a testator to the benefit of those for whom it was not intended, that the mind revolts at it." This observation was made in a somewhat different though analogous connection. It is none the less apt, however, in its application to the result that would follow if the contention of the complainants in this case should be sustained.

That such was not the testator's intention is conclusively manifested by the provision that, if any of the children or grandchildren (as we have construed it) die

without descendants, the income shall become a part of the trust estate and be distributed pro rata to the remaining beneficiaries and the provisions of Article Sixth giving the corpus to the children and grandchildren "with the same conditions and with the same limitations and survivorships already pointed out with respect to the receipt and distribution of the income during the term of the trust."

In the construction of a will where the intention as expressed is ambiguous or obscure, such construction will be adopted if possible that will dispose of the property in a just, natural or reasonable manner. In the absence of an expressed intention to the contrary, favor will be accorded to those beneficiaries who appear to be the natural and special objects of the testator's bounty. Again, a construction will be favored which conforms most nearly to the general laws of inheritance and which will prefer those of the blood of the testator to strangers or to persons not so closely related to the testator. The beneficiaries will be favored whenever possible; and, finally, testamentary provisions for support are highly regarded by law. 69 C. J., 100, 101, 102, 103.

Applying these rules, we think the proper construction is that, when the testator said in effect that the wife of the grandson David should be entitled to his share in the event of his death without descendants leaving a wife surviving him, he meant that she should succeed to the interest that her husband took under the will, no more, no less. It necessarily follows that the interest she took in the income and in the corpus was subject to the same limitations, restrictions and conditions, as was the interest of her husband. This, by clear implication as forceful and expressive as if it had been particularly stated.

██ In so far as the interest given the grandson David is concerned, in no other view is it possible to give any effect to the provision of Article Fourth and Article Sixth that in case of his death without descendants his share should be distributed pro rata among the other beneficiaries. It is true that in the situation that developed there is an apparent conflict between this provision and that for a surviving wife of that grandson and this would be true in any view of the matter. In these circumstances the construction must be adopted that is more nearly in accord with the dominant scheme of the will; that will more effectively promote the primary object, which in this case, as we have said, was support of the natural objects of the testator's bounty, and one that will produce a just and natural result. It follows that the provision for the pro rata distribution of the share of the grandsons Samuel and David in case of their deaths without descendants during the term of the trust, must be construed to be subject to the right of a surviving wife to support from the deceased husband's share for that period.

One of the principles governing the construction of wills which supports this conclusion has been aptly expressed by Chief Justice Rugg speaking for the Massachusetts court in Lamb v. Jordan, 233 Mass., 335, 123 N. E., 782, 784. ''The decision of all questions'', said the Chief Justice, ''respecting the construction of wills 'depends upon the intention of the testator as manifested by the words he has used, and an omission to express his intention cannot be supplied by conjecture. But if a reading of the whole will produces the conviction that the testator must necessarily have intended an interest to be given which is not bequeathed by express and formal words,' or a benefaction to be denied . . . 'the court must supply the defect by implication, and so mould

the language of the testator as to carry into effect as far as possible the intention which it is of opinion that he has on the whole will sufficiently declared.' Metcalf v. First Parish in Framingham, 128 Mass., 370, 374; Polsey v. Newton, 199 Mass., 450, 85 N. E., 574, 15 Ann. Cas., 139; Jones v. Gane, 205 Mass., 37, 44, 91 N. E., 129.''

■ It follows that for the reasons stated in connection with the nature and extent of the interest of her husband, Dixie Anne Davis Sullins, as subsitutional beneficiary, took no transmissible interest in either the income or the corpus of the estate.

■ The complainants pointedly ask, if the equitable fee did not vest in interest in the beneficiaries during the term of the trust, where was it? They inquire whether in that event it must be regarded as suspended in the air. We think the answer is to be found in the rule that if not disposed of by the will the inheritance passes by operation of law to the heirs pending the determination of a contingency upon which a future estate is made to depend. First Nat. Bank v. Pointer, 174 Tenn., 472, 481, 126 S. W. (2d), 335, and cases cited. Manhattan Savings Bank & Tr. Co. v. Bedford, 161 Tenn., 187, 30 S. W. (2d), 227.

■ In the present case the trustee took the entire interest to the extent necessary to accomplish the purposes of the trust, holding any surplus in trust for those properly entitled. The reversionary interest passed by operation of law to the heirs and distributees of the testator pending the event contemplated by Article Sixth upon which the estates therein created were to arise. See Magevney v. Karsch, 167 Tenn., 32, 63-67, 65 S. W. (2d), 562, 92 A. L. R., 343.

Solicitors for the complainants and the guardian ad litem for minor cross-defendants, who were also named

as complaintants, have sued out a writ of error seeking a review of the action of the chancellor in declining to allow them reasonable attorneys' fees for services rendered in the trial of the cause, to be paid out of the estate.

The contention of complainants' solicitors is that the complainants were impleaded in the cross-bill whereby the executors and trustee sought a construction of the will, and that the services rendered promoted that end.

 Fees for the services of an attorney not employed by the personal representative are sometimes allowed out of the assets but only where the services have inured to the benefit of the estate. The estate here is a trust for a specific purpose. In view of the conclusion we have reached as to the construction of the will, the services rendered by the plaintiff's in error must be regarded as designed and calculated to bring about a breach of the trust, not preserve it. There is, we think, no rational basis for charging the estate with the payment for services of that kind. While the situation was somewhat different in the case of Tramell v. Tramell, supra, the rationale of the conclusion denying a similar claim is against the allowance in this case.

 We are constrained to reach the same conclusion with respect to the claim of the guardian ad litem. The case of American Nat. Bank v. Meadors, 162 Tenn., 324, 326, 36 S. W. (2d), 86, does not, we think, support the contrary view. In that case the minor defendants were making no claim to any part of the estate and they were in no sense responsible for the uncertainty which necessitated the filing of the bill to construe the will to which they were necessary party defendants. That was the basis of the decision in that case allowing the guardian ad litem fees out of the assets of the estate.

Just the contrary is true in this case. The minors were original complainants making vigorous claim to a part of the estate and, as such, in full part responsible for the uncertainty which made the filing of a cross-bill advisable and which so far as appears had not therefore existed.

The result upon the whole case is that the decree of the chancellor is in all respects affirmed at the cost of complainants, except the cost incident to suing out the writ of error by a guardian ad litem and solicitors for complainants, which will be adjudged against the plaintiffs in that writ, and their sureties.

If it is deemed necessary, the case upon seasonable application of defendants and cross-complainants, will be remanded to the Chancery Court of Knox County for further proceedings consistent with the views herein expressed.

Ketchum and Baptist, JJ., concur.